RICHARD J. MCCRILLIS, demandante y recurrente, *v.* AUTORIDAD DE LAS NAVIERAS DE PUERTO RICO y OTROS, demandados y recurridos; AUTORIDAD DE LAS NAVIERAS DE PUERTO RICO y PUERTO RICO MARINE MANAGEMENT, INC., demandantes y recurridas, *v.* FROILÁN ANSA y ROBERTO LUGO D'ACOSTA, ETC., demandados y recurrente el primero; AUTORIDAD DE LAS NAVIERAS DE PUERTO RICO y PUERTO RICO MARINE MANAGEMENT, INC., demandantes y recurridas, *v.* ROBERTO LUGO D'ACOSTA, por sí y en representación de su SOCIEDAD LEGAL DE GANANCIALES, demandados y recurrentes.

*Números:* CE-85-464      *Resueltos:* 19 de enero de 1989
RE-85-415
RE-85-414

*A.J. Amadeo Murga,* abogado del recurrente Froilán Ansa; *Raúl Barrera Morales* y *Luis R. Mellado González,* de *Mellado & Mellado,* abogados del recurrente Roberto Lugo D'Acosta; *José Luis González* y *Marcos A. Ramírez Lavandero,* de *Ramírez & Ramírez,* abogados de la recurrida Autoridad de las Navieras de Puerto Rico; *Gilberto Mayo Aguayo* y *Gilberto Mayo Pagán,* de *Mayo & Mayo,* abogados de los recurridos Puerto Rico Marine Management, Inc. y Sergio Casaine.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

La cuestión esencial debatida en los tres (3) recursos consolidados que hoy enjuiciamos se reduce a lo siguiente: ¿Puede un empleado gubernamental, que ejerce funciones normativas, perpetuarse *mediante contrato* en una posición de confianza vinculada íntimamente con el desempeño de un servicio público fundamental? El Tribunal Superior entendió que no. Confirmamos.

## I

Los hechos que delimitan el ámbito de la cuestión planteada en los tres (3) recursos son los siguientes:

A. En marzo de 1979 el demandante Sr. Richard J. McCrillis comenzó a trabajar en la Autoridad de Las Navieras de Puerto Rico (en adelante Navieras). Entre 1979 y 1981 ocupó allí varias posiciones de confianza. Primero se

desempeñó como *Senior Financial Auditor* y luego fue ayudante del entonces Director Ejecutivo, el Sr. Roberto Lugo D'Acosta. En junio de 1981 fue nombrado Primer Vicepresidente de Finanzas de la codemandada Puerto Rico Marine Management, Inc. (en adelante P.R.M.M.I.), una corporación organizada bajo las leyes del estado de Delaware y subsidiaria de Navieras al momento de los hechos. Navieras era la dueña de los activos y establecía la política corporativa; P.R.M.M.I. actuaba como agente gerencial y administrativo.[1]

Así las cosas, el 1ro de julio de 1983 el recurrente Lugo D'Acosta, en su carácter de principal oficial ejecutivo de P.R.M.M.I., suscribió con McCrillis un contrato denominado *Guaranteed Employment Agreement.* Anejo I, págs. 9–20. Según admitió el propio McCrillis en el juicio, el contrato no alteró la naturaleza de su cargo y continuó ejerciendo las mismas funciones de su plaza anterior que dejó vacante. T.E. de 14 de marzo de 1985, pág. 21. De acuerdo con la determinación de hecho Núm. 7 del tribunal de instancia, la cual está ampliamente sostenida por la prueba, el demandante participaba activamente en la formulación de la política corporativa y establecía los programas y procedimientos relacionados con los controles financieros, el presupuesto y la contabili-

---

[1] A tenor con este esquema, dichos servicios se ofrecieron en los primeros años gracias a la relación funcional existente entre la Autoridad de las Navieras de Puerto Rico (en adelante Navieras) y su compañía operadora Puerto Rico Marine Management, Inc. (en adelante P.R.M.M.I.). El 30 de junio de 1978 Navieras adquiere el cien por ciento (100%) de las acciones de P.R.M.M.I. Hasta esa fecha, y desde el 2 de agosto de 1974, P.R.M.M.I. fue una corporación privada incorporada en Delaware que se desempeñaba como agente general de Navieras, su único y exclusivo cliente. En marzo de 1985 se negoció la venta de las acciones de la compañía operadora P.R.M.M.I. a la compañía T.N.T. Containerships, Inc. De esa forma, P.R.M.M.I. dejó de ser una subsidiaria propiedad de Navieras y se convirtió nuevamente en una compañía privada a cargo de las operaciones de Navieras mediante un contrato de administración. Nuestros pronunciamientos, por lo tanto, están condicionados por las circunstancias existentes al momento de los hechos alegados en la demanda.

dad. En el área de tesorería, manejaba un presupuesto de tres (3) millones de dólares, ingresos anuales de $270 millones y gastos anuales de $210 millones. Supervisaba directamente a dos (2) ejecutivos principales: el Contralor y el Tesorero. También tenía a su cargo varias divisiones y supervisaba indirectamente a otros noventa (90) empleados. En esa posición, McCrillis respondía únicamente al Director Ejecutivo.

Un examen del contenido de la relación contractual revela, entre otros extremos, que el salario aumentó de $50,280 a $59,700 sin posibilidad de reducción, aunque sí de aumento. McCrillis obtuvo una garantía de empleo por cuatro (4) años. Según el acuerdo, cualquier revisión sustancial de deberes, sin la anuencia del demandante, constituía incumplimiento.

El contrato sólo podía resolverse por causas justificadas o, de lo contrario, la corporación estaba obligada a pagar en concepto de cláusula penal los salarios no devengados. Se estipuló igualmente, para gobernar el proceso, una cláusula de arbitraje compulsorio con selección de la ley del estado del domicilio del empleado. El demandante también tenía derecho a todos los beneficios de que gozaban los altos ejecutivos de Navieras. Ello incluía automóvil, tarjetas de crédito y gastos de representación. Por último, se acordó una "cláusula de separabilidad" para que, en caso de que algún tribunal con jurisdicción declarase parcialmente nulo el contrato, no se afectaran las restantes disposiciones y partes del mismo.

Luego de celebrados los comicios generales en Puerto Rico, el 2 de enero de 1985 el Gobernador Rafael Hernández Colón tomó posesión de su cargo y ratificó el nombramiento de los miembros de la Junta de Gobierno de Navieras. La junta celebró su primera reunión el 4 de enero de 1985 y procedió de inmediato a confirmar la designación del Lic. Esteban Dávila como Director Ejecutivo de Navieras, y la del Sr. Sergio Casaine como Presidente de P.R.M.M.I.

El 4 de enero de 1985 McCrillis recibió una visita del Sr. Enrique González. Éste le notificó formalmente que Casaine lo había nombrado "Vice Presidente de Finanzas y Contraloría" de P.R.M.M.I. Tenía directrices específicas de tomar el control administrativo de las áreas bajo la responsabilidad del demandante. Toda determinación significativa debía discutirla previamente con González. T.E. de 14 de marzo de 1985, págs. 22 y 69.

El nuevo grupo gerencial comenzó a recopilar información necesaria para familiarizarse con las operaciones de P.R.M.M.I. McCrillis se negó a cooperar con el grupo de transición y a ser supervisado por González. Entendía que ello implicaba una renuncia a sus prerrogativas contractuales. T.E. de 14 de marzo de 1985, págs. 66–69. La situación se tornó tensa rápidamente. El 8 de enero el propio Sergio Casaine recabó la cooperación del demandante. Íd., pág. 64. Al otro día, le reiteró que debía canalizar sus planteamientos a través de González, pero su intervención personal no resolvió el problema surgido entre González y McCrillis. Este último continuó negándose a someter la información requerida. Al día siguiente, Casaine decidió despedir a McCrillis.

El mismo día de su despido, McCrillis inició una acción civil en el Tribunal Superior al amparo de la Ley de Derechos Civiles de Puerto Rico, Ley Núm. 12 de 8 de agosto de 1974 (32 L.P.R.A. sec. 3524). Demandó a Navieras, a P.R.M.M.I., a Esteban Dávila y a Sergio Casaine en sus capacidades oficiales. Solicitó remedios de entredicho provisional, *injunction* preliminar y permanente, y sentencia declaratoria. Alegó, fundamentalmente, que su despido respondió "única y exclusivamente a un discrimen político".

Tanto Navieras como P.R.M.M.I. contestaron la demanda y negaron la existencia de discrimen. Plantearon, entre innumerables defensas alternativas, la nulidad del contrato, justa causa para la resolución de acuerdo a su clausulado, la condi-

ción de confianza del empleado conforme a la Ley de Personal del Servicio Público de Puerto Rico (en adelante Ley de Personal), Ley Núm. 5 de 14 de octubre de 1975, según enmendada, 3 L.P.R.A. sec. 1301 *et seq.*, y como última dimensión del argumento, que la afiliación política del demandante era un requisito apropiado para el puesto.

Por su parte Navieras, al contestar la demanda, presentó una reconvención contra McCrillis y una demanda de tercero contra el anterior Director Ejecutivo Lugo D'Acosta. En esta última, Navieras suplicó que se condenase a Lugo D'Acosta al pago de todo o parte de lo que aquella viniese obligada a resarcirle al demandante. Lugo D'Acosta, a su vez, reconvino por difamación contra Navieras y P.R.M.M.I. Alegó que en la demanda contra tercero interpuesta en su contra se le hicieron unas imputaciones libelosas. Ambas entidades solicitaron la desestimación de la reconvención, cuya resolución aún está pendiente y no forma parte de este proceso de revisión.

B. El pleito de *Autoridad de las Navieras y Puerto Rico Marine Management, Inc. v. Froilán Ansa y Roberto Lugo D'Acosta, etc.*, Caso Núm. RE-85-415, consolidado con *Richard J. McCrillis v. Autoridad de Navieras de Puerto Rico y otros*, Caso Núm. CE-85-464, aunque de distinta génesis y desarrollo, tiene una misma raíz. El Sr. Froilán Ansa comenzó a trabajar con Navieras en mayo de 1977 como Director de Servicios al Consumidor. El 1ro de julio de 1978 fue nombrado Director de Mercadeo de P.R.M.M.I. y, finalmente, el 10 de mayo de 1980 pasó a ocupar el puesto de "Vice-Presidente Ejecutivo a cargo de la Región de Puerto Rico y el Caribe . . .". *Exhibit* I, pág. 5.

La sala de instancia estimó probado que "[l]as funciones del señor Ansa consistían en formular los programas, planes y métodos diseñados para generar y desarrollar los ingresos por concepto de ventas, además de dirigir, coordinar, implementar [sic] y evaluar las actividades relacionadas con el

transporte marítimo. Pertenecía a la alta gerencia de la corporación, respondiendo directamente a su Presidente. En tal capacidad, formulaba política pública, tenía acceso a información confidencial y disfrutaba de los beneficios de los ejecutivos; tales como, automóvil y tarjetas de crédito". *Exhibit* I, págs. 5–6.

El 1ro de julio de 1983 los codemandados Ansa y Lugo D'Acosta suscribieron otro de los denominados "contratos de garantía". Al igual que McCrillis, Ansa obtuvo una garantía de empleo hasta el 30 de junio de 1987, pero no se alteró la naturaleza de su cargo. A principios de enero de 1985, Ansa fue separado de su empleo por alegadas razones económicas. Mientras se tramitaba el caso instado por McCrillis contra Navieras, se inició el procedimiento de arbitraje dispuesto en la cláusula Núm. 8 del contrato. *Exhibit* II, pág. 7.

Días después, Ansa recibió el emplazamiento de una demanda en la que Navieras y P.R.M.M.I. solicitaban la nulidad del contrato e *injunction* permanente para impedir que continuara el procedimiento de arbitraje. En la contestación a la demanda, Ansa hizo una reserva de derechos constitucionales federales y, acto seguido, presentó una acción civil en el Tribunal de Distrito federal por alegada violación de derechos civiles. 42 U.S.C. sec. 1983. Esta causa quedó en suspenso bajo la doctrina de abstención y principios de federalismo hasta tanto fuera resuelta la controversia fundamental en el presente caso.

C. Ambos casos siguieron separadamente su curso en el Tribunal Superior. En el pleito *Richard J. McCrillis v. Autoridad de Navieras de Puerto Rico y otros*, supra, luego de varios incidentes procesales, se celebró la vista de *injunction* preliminar durante el 14 de marzo, 27 de marzo y 9 de abril de 1985. Las partes sometieron sus alegatos y, finalmente, el 6 de mayo de 1985 el tribunal a quo dictó la sentencia objeto del recurso CE-85-464.

En un extenso dictamen, la sala de instancia declaró la nulidad del contrato de empleo por contravenir la política pública que permite la "libre remoción" de los empleados de confianza tras un cambio de administración gubernamental, las normas del Secretario de Hacienda relativas a la contratación de servicios profesionales y el orden público establecido en nuestra jurisprudencia en los casos relacionados con empleados de confianza. En cuanto al alegado discrimen, dicho foro resolvió "que la prueba desfilada por el demandante es débil e insuficiente para establecerlo y que el factor motivante para el despido fue su insubordinación, la falta de cooperación y de confianza". Opinión y sentencia parcial, pág. 21. Quedó pendiente la controversia sobre la devolución de los salarios devengados.

En virtud del mismo razonamiento, se impuso igual determinación tres (3) meses después en el caso *Autoridad de las Navieras y Puerto Rico Marine Management, Inc. v. Froilán Ansa y Roberto Lugo D'Acosta, etc.*, supra. A instancias de la parte demandante, el 1ro de agosto de 1985 el tribunal dictó una sentencia sumaria parcial que paralizaba los procedimientos de arbitraje y declaraba nulo el contrato.

McCrillis oportunamente presentó escrito de apelación al que dimos curso como recurso de revisión el 22 de agosto de 1985. Por su parte, los codemandados Ansa y Lugo D'Acosta recurrieron ante este Foro con solicitudes separadas de revisión (RE-85-414 y RE-85-415). Todos los recursos giran en torno a tres (3) controversias: (1) si el principio de mérito que establece la Ley de Personal aplica a P.R.M.M.I.; (2) si los "contratos de empleo garantizado" son válidos, y (3) si el despido del recurrente McCrillis fue por causa de discrimen

político. Luego de celebrar vista oral, expedimos los recursos y consolidamos las tres (3) causas.(²) Resolvemos.

## II

Antes de entrar a examinar los distintos aspectos objeto de debate, procede que nos expresemos sobre dos (2) asuntos preliminares.

■ El tribunal a quo sostuvo como posición procesal la validez del mecanismo sumario en el caso *Autoridad de las Navieras y Puerto Rico Marine Management, Inc. v. Froilán Ansa y Roberto Lugo D'Acosta, etc.*, supra. Actuó correctamente. El caso sólo presentaba una controversia de derecho; no había cuestiones de hecho relevantes que dilucidar. Procedía que el tribunal de instancia dictara sentencia sumaria. En paráfrasis de lo resuelto en *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975), los autos ante nuestra consideración revelan que el producto neto y final sometido con la solicitud de sentencia sumaria constituía un planteamiento de estricto derecho. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

Tampoco tiene méritos el argumento de que no procedía una determinación sobre la validez del contrato en la fase de *injunction* preliminar. Tal argumento se fundamenta en un

---

(²) Ordenamos que se elevara la transcripción de la evidencia en el caso *Richard J. McCrillis v. Autoridad de Navieras de Puerto Rico y otros*, Caso Núm. CE-85-464, y dimos un término simultáneo a las partes para someter alegatos. En el caso *Autoridad de las Navieras y Puerto Rico Marine Management, Inc. v. Froilán Ansa y Roberto Lugo D'Acosta, etc.*, Caso Núm. RE-85-415, no existe transcripción de la prueba por haberse decidido en el tribunal de instancia mediante sentencia sumaria. El codemandado Ansa renunció a su derecho a presentar alegato y sometió su recurso a base de los fundamentos aducidos en la solicitud de revisión. El codemandado Lugo D'Acosta, por su parte, presentó alegato en apoyo de su recurso, aunque no recurrió en el caso CE-85-464. Navieras y P.R.M.M.I. presentaron alegatos conjuntos en los que discuten las cuestiones planteadas.

supuesto acuerdo procesal para limitar la cuestión litigiosa en esta etapa a la determinación de la procedencia del despido desde el punto de vista constitucional. El tribunal a quo rechazó ese planteamiento en la vista de 27 de marzo de 1985, y de la minuta de 4 de marzo tampoco surge tal convenio. T.E. de 27 de marzo de 1985, págs. 154–160.

Ni como cuestión de mecánica procesal ni desde el punto de vista de derecho sustantivo era posible hacer una determinación sobre el derecho de reinstalación de McCrillis a su posición en abstracción del asunto de la validez del contrato. No empece la oposición de McCrillis a la consolidación de las vistas de *injunction* preliminar y permanente, en la dinámica procesal para todos los efectos prácticos ambas quedaron consolidadas al presentar la parte demandada su moción de desestimación y poner en controversia la validez del contrato sin objeción del demandante.

## III

No cabe duda que todas las controversias planteadas dependen de la determinación sobre la naturaleza pública o privada de la subsidiaria. Nótese que si P.R.M.M.I. fuese una entidad totalmente privada, no habría razón para dudar del alcance de los compromisos celebrados, así como tampoco existiría —en principio— acción estatal (*state action*) que diera fundamento a una reclamación por discrimen político.[3]

Los recurrentes McCrillis, Ansa y Lugo D'Acosta afirman que, al momento de los hechos alegados en la demanda, P.R.M.M.I. era una corporación privada para todos los fines. Entienden que el caso de *Torres Ponce v. Jiménez*, 113

---

[3] La cuestión no recibe, desde el punto de vista del recurrente McCrillis, un tratamiento enteramente coherente. En efecto, si se admite en su plenitud la tesis del carácter netamente privado de P.R.M.M.I., no se puede explicar el argumento de discrimen político en los términos formulados.

D.P.R. 58 (1982), es distinguible de éste puesto que allí la ley habilitadora expresamente facultaba a la Autoridad de Teléfonos a adquirir todas las acciones emitidas por la Puerto Rico Telephone Company. En otras palabras, existía un mandato expreso y específico para dicha adquisición, mientras que en el caso de P.R.M.M.I. la compra se hizo mediante un acto administrativo. Navieras alega, por su parte, que de acuerdo con lo resuelto en *Torres Ponce v. Jiménez*, supra, el criterio básico para determinar si estamos ante un ente corporativo "público-privado" es el del control gubernamental.

Diversas razones abonan a esta última conclusión. La prueba en efecto establece que, al momento de los hechos, Navieras era la tenedora del total (100%) de las acciones de P.R.M.M.I. Como tal, se encontraba bajo el completo dominio y control de Navieras.

Este aspecto de la controversia se trata de una consecuencia lógica de nuestra opinión en *Torres Ponce v. Jiménez*, supra. Allí, los hechos probados fueron que la Autoridad de Teléfonos era dueña del cien por ciento (100%) de las acciones de la Puerto Rico Telephone Company. Fundados en ese dato, resolvimos que las entidades emisoras de acciones, organizadas al amparo de las leyes de corporaciones privadas que están controladas totalmente por el Gobierno, son empresas *público-privadas.*

Las corporaciones públicas "[s]on parte importante de la organización administrativa del Estado moderno". C. Ramos de Santiago, *El Gobierno de Puerto Rico*, Barcelona, Ed. Universitaria, 1979, pág. 653. Las mismas ocupan sectores muy amplios de la vida económica moderna. La variedad de formas y la enorme disparidad de regímenes jurídicos a que pueden estar sometidas, han dado paso a un amplio temario. Véanse: A.R. Brewer Carías, *Las empresas públicas en el derecho comparado*, 37 Revista de la Facultad de Derecho (1967); W. Friedmann, *Governmental (Public) Enterprises*, XIII-13 *International Encyclopedia of Comparative Law* 3

*et seq.* (1979); D.E. Lilienthal y R.H. Marquis, *The Conduct of Business Enterprises by the Federal Government*, 54 (Núm. 1) Harv. L. Rev. 545 (1941); N. Hamilton, *Foreword: Symposium on Governance of Public Enterprises*, 67 (Núm. 1) Minn. L. Rev. 179 (1982); H.G. Henn y J.R. Alexander, *Laws of Corporations and other Business Enterprises*, 3ra ed., Minnesota, Ed. West Publishing Co., 1983, pág. 173 *et seq.*; Friedmann, *The Public Corporation: A Comparative Symposium*, Canadá, Ed. The Carswell Company, Limited, 1954.

La corporación pública tiene un extenso historial en Puerto Rico, particularmente después de 1940, cuando se inició el programa de desarrollo socioeconómico. Estas empresas gubernamentales se crearon con diversos propósitos, entre otros, para reducir los costos, mejorar los servicios ofrecidos por el Estado y proveer la infraestructura necesaria para el crecimiento industrial. Ramos de Santiago, *op. cit.*, págs. 654–657.

■ En ocasiones, estas corporaciones públicas nacen y son producto de situaciones de emergencia como la que atravesaba la isla en el área del tráfico marítimo en la década de los setenta. Un examen de las disposiciones pertinentes de la ley que crea a Navieras y de su historial legislativo revela una clara intención del legislador de dotar a esta corporación y a sus órganos operacionales de la flexibilidad y autonomía necesarias para poder enfrentar con éxito el ambiente cambiante de un mercado particularmente competitivo.

Las Navieras se creó al amparo de la Ley Núm. 62 de 10 de junio de 1974 (23 L.P.R.A. sec. 3051 *et seq.*), en atención a dos (2) circunstancias básicas: la extrema dependencia de nuestro pueblo en la transportación marítima y el estado de deterioro del servicio existente.

En 1973 el comercio exterior representó para Puerto Rico el noventa y cuatro por ciento (94%) de su producto

nacional bruto. En ese mismo año se pagaron en importaciones 255.3 millones de dólares en fletes marítimos. Debido a esta situación, y como parte del fenómeno inflacionario existente, la economía local tuvo que absorber aumentos en fletes de veinticinco por ciento (25%) y quince por ciento (15%) en las travesías desde y hacia Puerto Rico respectivamente.

El Gobierno de Puerto Rico tomó en consideración esta situación y comenzó estudios y negociaciones con las principales compañías navieras dedicadas al tráfico comercial entre Puerto Rico y Estados Unidos. Luego de acuerdos tentativos, se negoció la adquisición de los activos de las tres (3) empresas que servían la ruta. Para obtener el capital de operaciones inicial, el Banco Gubernamental de Fomento concedió una línea de crédito.

La intención legislativa claramente fue la de crear una instrumentalidad que operase las facilidades de terminales y de transportación marítima como un servicio público. Aunque en el esquema previsto Navieras retendría para su decisión "todos aquellos asuntos de política pública tales como fletes, adquisición de buques, mantenimiento, contactos con la Comisión Marítima Federal, arrendamiento de terminales, auditoría, etc.", se recomendó en los trabajos preparatorios de la ley que se dejara en manos privadas la administración de la operación. Informe de la Comisión Especial a Cargo del Estudio y Consideración del Sustitutivo del P. del S. 383, Cámara de Representantes, pág. 24. Véase, también, Informe de la Comisión Especial designada para estudiar el P. del S. 991 y el P. del S. 383.

■ Para asegurar que la empresa cumpliese exitosamente su encomienda, la Asamblea Legislativa otorgó vastos poderes a Navieras. Entre estas facultades estaba la de adquirir por compra las acciones emitidas por cualquier corporación privada. 23 L.P.R.A. sec. 3055(g), (j) y (s). Al amparo

de estas disposiciones, Navieras inicialmente contrató con P.R.M.M.I. la administración de sus operaciones y, con el tiempo, la adquirieron. Bajo este diseño, P.R.M.M.I. indudablemente constituía una entidad gubernamental. El Estado tenía algo más que un mero interés como accionista; poseía la *totalidad* de las acciones comunes emitidas por la subsidiaria.

No debemos sobreponer la forma a la sustancia. A la luz de estos datos no disputados, queda sin apoyo el argumento de los recurrentes. No existe diferencia entre los hechos de este caso y los de *Torres Ponce v. Jiménez*, supra. Nótese que el Director Ejecutivo de Navieras era el principal oficial ejecutivo de P.R.M.M.I. (*Chief Executive Officer*), por lo que resulta lógico inferir que P.R.M.M.I. no actuaba de manera independiente en la consecución de unos fines de naturaleza privada, sino que respondía cabalmente al fin esencial perseguido por las normas de política pública trazadas en la Ley Núm. 62, *supra*.

■ Si tomamos como fundamento la totalidad de las disposiciones pertinentes de la ley, así como sus fines y política pública, no podemos convenir con la tesis central de los recurrentes de que P.R.M.M.I., a pesar de haber sido adquirida por Navieras con fondos pertenecientes al Estado Libre Asociado de Puerto Rico, continuó siendo una entidad corporativa privada bajo las leyes de Delaware. Siguiendo la razón de decidir de *Torres Ponce v. Jiménez*, supra, concluimos que P.R.M.M.I. era para todo propósito un instrumento de la política pública del Estado, a pesar de tener algunos atributos privados. *Torres Ponce v. Jiménez*, supra, pág. 65. La figura de la subsidiaria —propiedad del Estado— representa un concepto preciso que hoy reafirmamos. Véase Adams, *The National Railroad Passenger Corporation—A Modern Hybrid Corporation Neither Private Nor Public*, 31 Bus. Law. 603 (1976).

## IV

La segunda controversia, en la misma línea que la anterior, viene determinada por la conclusión que precede. Debemos determinar si los contratos aquí en cuestión son nulos por ser contrarios a la política pública que rige la administración del personal en el servicio público.

McCrillis y los otros recurrentes aducen que la ley que crea a Navieras expresamente exonera a dicha entidad y a sus subsidiarias del cumplimiento con la Ley de Personal y su Reglamento aprobado por la Oficina Central de la Administración de Personal. Se fundamentan los recurrentes en el Art. 5(h), (i) y (u) de la Ley Núm. 62, *supra* (23 L.P.R.A. sec. 3055(h), (i) y (u)), así como también en los Arts. 7, 11, 25 y 26 de la ley orgánica de esa corporación pública.

Los recurridos básicamente admiten que dicha ley faculta a Navieras y sus subsidiarias a contratar la administración de las operaciones de las empresas bajo su control. 23 L.P.R.A. sec. 3055. Admiten, también, que ésta autoriza la contratación de servicios personales y administrativos de acuerdo con la práctica prevaleciente en la industria marítima. Argumentan, no obstante, que "dichas disposiciones, en lo que sean incompatibles con el principio de mérito, quedaron derogadas por la Sección 10.2 de la Ley de Personal [3 L.P.R.A. sec. 1301] . . .". *Exhibit* III, pág. 5

Esta afirmación no tiene el alcance que le atribuyen los recurridos. Los tribunales no favorecen las derogaciones tácitas. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 419. Una ley general no deroga disposiciones de una ley especial a menos que tal derogación se consigne expresamente o surja claramente de la voluntad legislativa. En correcta hermenéutica debemos presumir que el legislador tenía conocimiento de otras leyes

vigentes cuando aprobó la Ley de Personal. *Pueblo v. Franceschi*, 74 D.P.R. 825, 831 (1953); *Cooperativa Cafeteros v. La Capital*, 82 D.P.R. 51, 58 (1961); *Hernández v. Fournier*, 80 D.P.R. 93, 102 (1957).

La necesidad de dar una solución justa a la presente controversia nos exige que encaremos el problema con horizontes más amplios, conscientes de que en las corporaciones públicas surgen conflictos entre dos (2) objetivos de importancia: por un lado, la flexibilidad y la autonomía; por el otro, la necesidad de que estas empresas funcionen en armonía con los objetivos básicos de gobierno. Con estas consideraciones en mente, se impone una solución jurídica conciliadora de las tensiones esbozadas. La presencia de un interés público en estos contratos justifica que revisemos el alcance de los compromisos celebrados.

Para los recurrentes, los contratos impugnados tienen consentimiento, objeto y causa, por lo que son perfectamente válidos. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Alegan que bajo el esquema legal que provee la Ley Núm. 62, *supra*, Lugo D'Acosta, como principal ejecutivo de P.R.M.M.I., estaba autorizado para obligar a la empresa.

■ Si contemplamos el problema de esta forma limitada, hay que concluir que la normativa puramente civilista resulta insuficiente para explicar el fenómeno de la contratación en este caso. Aunque no dudamos que P.R.M.M.I. estaba sometida al derecho privado en lo que se refiere a sus relaciones con los proveedores, los usuarios y los clientes, en materia de régimen de personal, *Torres Ponce v. Jiménez*, supra, ya resuelto a la fecha de la otorgación de los contratos, constituía derecho positivo que vinculaba al Gobierno en su actuación.

■ La política pública del Estado Libre Asociado de Puerto Rico, en materia de la administración de su personal,

aparece establecida en la Ley de Personal. Dicha ley pretende establecer el principio de mérito en *todo* el servicio público, incluso en las agencias e instrumentalidades excluidas por la Ley de Personal. *Reyes Coreano v. Director Ejecutivo*, 110 D.P.R. 40 (1980).

■ Se trata de un ordenamiento de eminente orden público y así lo hemos reconocido consistentemente. *Ortiz Ortiz v. Depto. de Hacienda*, 120 D.P.R. 216 (1987); *Reyes Coreano v. Director Ejecutivo*, supra; *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667, 671–673 (1978); *Díaz González v. Tribunal Superior*, 102 D.P.R. 195, 211 (1974). Las corporaciones público-privadas también están obligadas a cumplir con dicho principio en cuanto a sus empleados no unionados. En vista de que P.R.M.M.I. no contaba al momento de los hechos con un reglamento que incorporara adecuadamente el principio de mérito, tenía que observar lo dispuesto en la Ley de Personal y su Reglamento. *Torres Ponce v. Jiménez*, supra; *Delgado Rivera v. Alcalde de Carolina*, 109 D.P.R. 5 (1979); *Delbrey v. Municipio de Carolina*, 111 D.P.R. 492 (1981).

■ A tenor con este ordenamiento, los puestos de confianza son de libre selección y remoción. Sec. 5.10 de la Ley de Personal, 3 L.P.R.A. sec. 1350. Nuestra jurisprudencia ha reconocido reiteradamente, tanto bajo la Ley de Personal actual como bajo la anterior, el poder de la autoridad nominadora para destituir a un empleado de confianza sin necesidad de la formulación de cargos ni de la celebración de una vista administrativa. *Pastor Lozada v. Director Ejecutivo*, 101 D.P.R. 923, 928–929 (1974); *Díaz González v. Tribunal Superior*, supra; *Ramos v. Srio. de Comercio*, 112 D.P.R. 514, 519 (1982); *Morales Narváez v. Gobernador*, 112 D.P.R. 761 (1982); *Clemente v. Depto. de la Vivienda*, 114 D.P.R. 763, 769 (1983); *Colón v. C.R.U.V.*, 115 D.P.R. 503 (1984); *Feliciano v. Mun. de Fajardo*, 115 D.P.R. 675 (1984).

■     Asimismo, la Ley de Personal faculta a las autoridades nominadoras a tomar las acciones relacionadas con el personal que sean necesarias para el desempeño público adecuado. Por ejemplo, permite la terminación del empleo por diversas razones, 3 L.P.R.A. secs. 1336(3) al (8) y 1350, los cambios en los deberes de los empleados, 3 L.P.R.A. sec. 1332(8), la autorización de descensos que afecten la retribución, 3 L.P.R.A. sec. 1334(6) al (8), y la protección de la buena administración de los beneficios marginales, 3 L.P.R.A. sec. 1355. De igual forma, la ley impone a las instrumentalidades públicas la obligación de crear puestos de carrera o de confianza para el desempeño de las funciones permanentes. 3 L.P.R.A. secs. 1332(1) y 1351(1).

■     Este esquema no sólo incide como límite de la autonomía corporativa, sino también como condicionante de la plena validez de los contratos de personal. Ante este cuadro de factores jurídicos no podemos coincidir con los recurrentes en que los contratos en controversia deben ser examinados exclusivamente bajo la perspectiva del Código Civil.

El foro primario adjudicó correctamente, con apoyo en la abundante evidencia presentada, que los puestos de Ansa y McCrillis estaban debidamente definidos dentro de la clasificación de confianza provista por la Sec. 5.10 de la Ley de Personal, *supra*. No obstante, mediante los contratos aquí impugnados, la autoridad nominadora no podía modificar los deberes de tales empleados, variar los beneficios marginales o el salario y deponerlos del empleo, excepto por las causas fijadas en el contrato dentro de un término de cuatro (4) años. Se acordó una cláusula penal para el caso de lo que se denominó *"justa causa"*. Mediante la misma se pretendía obligar a la agencia a pagar con fondos públicos los salarios no devengados por la duración del contrato. Notamos que el problema se plantea con especial rigor en aquellos contratos

de mayor duración, no necesariamente porque suponga mayores inversiones, sino porque produce la situación irregular del funcionario gerencial de libre selección, pero de facto no de libre remoción. Recientemente rechazamos la "figura del 'empleado de confianza por contrato', si ello conlleva un menoscabo en las facultades de remoción que la ley concede [al ejecutivo] . . .". *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 56 (1988).

◼ Esta realidad en modo alguno significa que Navieras o P.R.M.M.I., al momento de los hechos, estuviesen impedidas de formalizar contratos con garantías similares a las aquí impugnadas en áreas de consultoría o asesoramiento técnico especializado. Bajo los hechos del presente caso, no obstante, y examinadas las responsabilidades de los puestos en cuestión, la incorporación de un requisito de *justa causa para la terminación del empleo de un funcionario de confianza con responsabilidad de formular la política pública* constituye un acto nulo por ser contrario a la ley y a la política pública del Estado Libre Asociado de Puerto Rico.

La voluntad pública se desenvuelve en un marco normativo que define el auténtico consentimiento. El recurrente Lugo D'Acosta no actuaba como titular de los intereses públicos, sino sólo como su representante y defensor. En suma, como principal ejecutivo de P.R.M.M.I., Lugo D'Acosta podía concertar los contratos y pactos que tuviese por conveniente siempre que no fuesen contrarios al interés y al ordenamiento público, o a los principios de buena administración. Arts. 4 y 1207 del Código Civil, 31 L.P.R.A. secs. 4 y 3372.

## V

Llegamos así a determinar el alcance y efecto de las violaciones señaladas. No hay duda de que los nuevos incumbentes tanto de Navieras como de P.R.M.M.I. tienen legitimación activa para ejercer la acción de nulidad. El verdadero

asunto a resolver es si la nulidad de ciertas cláusulas del contrato acarrea la ineficacia del todo y si procede la devolución de lo cobrado a tenor con sus términos.

La doctrina civilista acepta que "en algunos casos puede emplearse la nulidad parcial como técnica de pervivencia de un negocio en cuyo contenido fundamental no incide la imputación de su parte nula, o, incidiendo, no impide que el conjunto negocial no afectado perviva con consistencia suficiente". A. Gordillo Cañas, *La nulidad parcial del contrato con precio ilegal*, 28 (Núm. 2) An. Der. Civ. 185 (1975); Gómez Martínez Faerna, *La nulidad parcial de los negocios jurídicos*, en Estudios de Derecho Privado (bajo la dirección de Martínez Radio), 1962, T. I, pág. 338; Delgado Echevarría, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1981, T. XVIII, Vol. 2, pág. 288 *et seq.*; Zannoni, *Ineficacia y nulidad de los actos jurídicos*, Buenos Aires, Ed. Astrea, 1986, pág. 159 *et seq.* Explícase el fenómeno de la forma siguiente:

> En primer lugar conviene destacar que no siempre que se produce un acto o negocio "contra legem" y, en su consecuencia, se sigue la sanción de su nulidad, no siempre —decimos— dicha sanción exige, sin más, la desaparición de la vida jurídica de lo actuado "contra legem", y la restitución de las cosas al "statu quo" en que se encontraban antes de la celebración del acto nulo. Cabe, en efecto, matizar los efectos de la nulidad. Así, "cuando el fin de la ley —dice De Castro— se dirija sólo contra un aspecto del acto, para que se cumpla la voluntad del legislador, se limitará la anulación a lo hecho contra la ley, manteniendo la validez de lo restante". Gordillo Cañas, *op. cit.*, pág. 179.

Para el profesor Díez-Picazo el problema consiste en decidir, en presencia de un supuesto de *ineficacia*, si ésta debe ser total o parcial "y cuáles han de ser las directrices generales para optar por uno u otro tipo". Concluye que la consideración decisiva es la *"intención práctica de las partes"*.

(Énfasis suplido.) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 294.

■ Un examen objetivo y sereno de la prueba vertida en instancia a la luz del texto del contrato demuestra que, independientemente de la irrelevancia jurídica de la parte cuya nulidad decretamos, los recurrentes Ansa y McCrillis —ejecutivos de experiencia en la industria de transporte marítimo— rindieron unas funciones perfectamente válidas desde el punto de vista estrictamente contractual. Las corporaciones recurridas se beneficiaron de estos trabajos. Lógico es que aquéllos devengaran unos salarios que en modo alguno se probó fueran excesivos para la industria en cuestión. Por común voluntad de las partes se estipuló, no obstante, la conservación parcial del contrato.[4] No hay interés social tutelado que impida esta solución. Díez-Picazo, *op. cit.*

■ Por lo tanto, no procede la devolución de lo pagado. Este aspecto de la controversia no tiene que aguardar a una resolución en instancia. Aun si nos colocásemos en la línea de la nulidad más radical, la solución que permite la restitución de las prestaciones en un caso donde una de éstas ya ha sido realizada *sin posibilidad de vuelta a la situación anterior*, es cuando menos injusta. Como expresamos en *Campos v. Tribl. Superior*, 75 D.P.R. 370, 381 (1953), citando a Castán, Colin y Capitant, "'cuando la resolución se aplica a contratos de *tracto sucesivo* como el arrendamiento ... ofrece el carácter específico de que, a diferencia de la resolución ordinaria,

---

[4] Lee la cláusula onceava de los contratos:
"11. *Severability of Provisions*: The covenants and agreements herein contained are separate and independent, and in the event any part or paragraph hereof shall be declared invalid by a court of competent jurisdiction, such invalidity shall not in any manner affect the validity or our enforceability of any other part or provision hereof." Anejo I, pág. 9.

no produce efecto retroactivo. . . . [L]as relaciones jurídicas . . . cesan para lo por venir, pero subsisten en lo pasado'". (Énfasis suplido.) Véase J.R. Vélez Torres, *Curso de Derecho Civil*, San Juan, Ed. Art Printing, 1981, T. IV, Vol. I, págs. 61–62. En España, por ejemplo, por disposición expresa de ley, "los efectos de la declaración de nulidad del contrato de trabajo no se retrotraen, sino que operan *ex nunc* . . .". Delgado Echevarría, *op. cit.*, pág. 294.

## VI

Atendamos, por último, el reclamo de McCrillis de que fue separado de su empleo por motivo de discrimen político. Como veremos, aun aceptando la tesis de que la protección constitucional se extiende al empleado "por contrato en funciones de confianza" dentro del sistema civil, el recurrente no probó en instancia un caso de despido por razones políticas.[5] Veamos.

Antes reconocimos que, en el caso de un empleado de confianza, la autoridad nominadora tiene entera libertad para despedir, trasladar, suspender y tomar cualquier otra acción que estime pertinente. 3 L.P.R.A. sec. 1350. No obstante esta realidad, al ponerla en juego con otras normas constitucionales, adquiere un contenido diferente. La condición de empleado de confianza de por sí no priva de la protección contra el discrimen político. *Ramos v. Srio. de Comer-*

---

[5] Para el recurrente Ansa el problema se plantea únicamente en el terreno de mantener o anular los contratos impugnados, controversia ya resuelta. No es necesario pasar juicio sobre si es o no eficaz la reserva de derechos federales hecha por los recurrentes Ansa y McCrillis. Nuestros pronunciamientos se limitan ex profeso a interpretar las normas que rigen en Puerto Rico —dentro de los alcances mínimos fijados por la Constitución federal— a la luz de la Constitución del Estado Libre Asociado en lo que se refiere a los despidos de empleados públicos por alegadas razones políticas. Aunque no estamos obligados a seguir la interpretación que otros tribunales le hayan dado a garantías similares, podemos acudir a los precedentes que, adaptados a las necesidades de nuestro medio, resulten persuasivos o ilustrativos.

*cio,* supra; *Franco v. Municipio de Cidra,* 113 D.P.R. 260, 264 (1982).

Los recurridos proponen que interpretemos la Ley de Personal de forma tal que concluyamos que el primer párrafo de la Sec. 5.10 de la Ley de Personal, *supra,* cumple con los criterios constitucionales. Es decir, exponen que las posiciones a las que se refiere la primera parte de ese párrafo —aquellos empleados que "intervienen o colaboran sustancialmente en la formulación de la política pública"— cumplen con la excepción a la prohibición constitucional de despidos de empleados públicos por razones políticas.

Reconocemos que los criterios elaborados por el legislador en la Sec. 5.10 de la Ley de Personal, *supra,* son un punto de partida valioso para el análisis de casos como el presente.[6] No obstante ningún legislador, por más casuísta y minucioso que sea, puede prever y dar solución a todos los casos que la vida ofrece. En materia de adjudicación constitucional nos corresponde hallar el principio que gobierne.

Al amparo del poder de interpretación de la Constitución, tanto el Tribunal Supremo de Estados Unidos como este Tribunal hemos concluido que las actuaciones gubernamentales están sujetas a limitaciones constitucionales. La aplicación judicial de la doctrina de las condiciones inconstitucionales requiere un cuidadoso balance de los intereses en conflicto. Véase M. Ramírez Lavandero, *La doctrina de las "condiciones inconstitucionales" en Puerto Rico,* XII (Núm. 1) Rev. Jur. U.I.A. 111, 118–134 (1977).

■ Como secuela de esta doctrina, hemos establecido normas que limitan las facultades del Estado para despedir empleados de confianza. *Ramos v. Srio. de Comercio,* supra;

---

[6] Dicha disposición lee, en lo pertinente, que:

"Los empleados de confianza son aquellos que intervienen o colaboran sustancialmente en la formulación de la política pública, que asesoran directamente o que prestan servicios directos al jefe de la agencia . . .". 3 L.P.R.A. sec. 1350.

*Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980). En general, impera el principio de que la autoridad nominadora no puede despedir válidamente a un empleado de confianza sólo por motivos políticos, o sea, por la sola razón de su afiliación política, *a menos* que pueda demostrarse que éste es un requisito apropiado para el desempeño eficiente de los deberes y responsabilidades del puesto. Se trata de una norma de naturaleza constitucional que tiene apoyo, en el caso de Estados Unidos, en la libertad de asociación protegida por la Primera Enmienda de la Constitución federal, L.P.R.A., Tomo 1, y en el caso de Puerto Rico, en el Art. II, Secs. 1, 4, 6 y 7 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1.

En *Ramos v. Srio. de Comercio*, supra, pág. 516, adoptamos la doctrina *Elrod-Branti* y resolvimos que "reca[ía] sobre la autoridad nominadora (el gobierno) desfilar prueba demostrativa de que la afiliación política particular del empleado es 'requisito apropiado' para el desempeño efectivo del cargo en cuestión, o sea, le corresponde establecer la existencia de intereses gubernamentales que son de importancia y jerarquía superior a los derechos del empleado bajo la Primera Enmienda". Véanse, también: *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972); *Colón v. C.R.U.V.*, supra; *Feliciano v. Mun. de Fajardo*, supra.[7]

---

[7] Para una discusión a fondo de la fórmula *Elrod-Branti*, véanse: Notas, *An Objective and Practical Test for Adjudicating Political Patronage Dismissals*, 35 (Núms. 1–2) Clev. St. L. Rev. 277 (1986–1987); Notas, *Politics and the Non-Civil Service Public Employee: A Categorical Aproach to First Amendment Protection*, 85 (Núm. 3) Colum. L. Rev. 558 (1985); Comentarios, *Consideration of Administrative Loyalty in Identifying Positions Exempt from the "Shakman" Decree*, 17 (Núm. 1) Loy. U. Chi. L.J. 119 (1985); Comentarios, *First Amendment Limitations on Patronage Employment Practices*, 49 (Núm. 1) U. Chi. L. Rev. 181 (1982); Notas, *Patronage Dismissals under a First Amendment Analysis: The Aftermath of Branti v. Finkel*, 25 (Núm. 1) St. Louis U.L.J. 189, 212 (1981); Notas, *Constitutional Law: The Impact of Branti v. Finkel on Political Patronage Employment*, 34 (Núm. 1) Okla. L. Rev. 93, 104 (1981); Notas,

■ En los aspectos procesales y probatorios, una demanda fundada en un despido por razones políticas es una acción civil ordinaria donde el demandante tiene el peso y la obligación primaria de presentar prueba. Regla 10(A) y (B) de Evidencia, 32 L.P.R.A. Ap. IV. Por supuesto, éste puede hacer uso de evidencia circunstancial y de presunciones que le favorezcan. Reglas 10(H) y 13 de Evidencia, 32 L.P.R.A. Ap. IV.

■ En *Báez Cancel v. Alcalde Mun. de Guaynabo*, supra, pág. 990, establecimos la presunción siguiente:

> ... [S]i no hay un motivo racional que justifique el despido y se sustituye al empleado por otro de diferente afiliación política, que resulta ser la misma del Alcalde, se crea una *presunción* de discrimen que el Alcalde viene obligado a refutar. (Énfasis suplido.)

Esta presunción está gobernada en sus alcances por la Regla 14 de Evidencia, que dispone:

> En una acción civil, una presunción impone a la parte contra la cual se establece la presunción el peso de la prueba para demostrar la inexistencia del hecho presumido. Si la parte contra la cual se establece la presunción no ofrece evidencia para demostrar la no existencia del hecho presumido, el juzgador debe aceptar la existencia de tal hecho. Si se presenta evidencia en apoyo de la determinación de la no existencia de tal hecho, la parte que interesa rebatir la presunción debe persuadir al juzgador de que es más probable la no existencia que la existencia del hecho presumido. 32 L.P.R.A. Ap. IV.

Nótese que, a tenor con la norma de *Báez Cancel v. Alcalde Mun. de Guaynabo*, supra, los hechos básicos que permiten la inferencia de discrimen político son los siguientes: (1) ausencia de un motivo racional que justifique el despido y (2)

---

*Constitutional Limitations on Patronage Practice: Branti v. Finkel*, 42 La. L. Rev. 310, 319 (1981); Comentarios, *The First Amendment Implications of Political Patronage Dismissals*, 27 Loy. L. Rev. 219 (1981).

la sustitución del empleado por otro de diferente afiliación política que resulte afín con la de la autoridad nominadora. En otras palabras, para que opere la presunción de *Báez Cancel*, supra, y pueda inferirse el discrimen político, el demandante tiene que aportar prueba que establezca los hechos básicos antes mencionados. De así hacerlo, el demandado viene obligado a ofrecer prueba conducente a demostrar la no existencia de los hechos básicos y, en consecuencia, la del hecho presumido. Sobre la naturaleza de las presunciones, véanse: E.L. Chiesa, *Sobre la validez constitucional de las presunciones*, XIV (Núm. 3) Rev. Jur. U.I.A. 727–730 (1980); *Primer examen de las Reglas de Evidencia de 1979: Comentarios y recomendaciones*, San Juan, Secretariado de la Conferencia Judicial, diciembre de 1986, pág. 55 *et seq.*

En *Colón v. C.R.U.V.*, supra, pág. 507, señalamos que la *alegación* de los allí recurrentes "de que fueron sustituidos por ser afiliados de un partido distinto crea[ba] una fuerte inferencia de que . . . el verdadero móvil" del despido fue el discrimen político.

La mención de que la alegación de discrimen crea una "fuerte inferencia" debe analizarse a la luz de los casos que allí citamos en apoyo, a saber, *Báez Cancel v. Alcalde Mun. de Guaynabo*, supra, y *Navedo v. Municipio de Barceloneta*, 113 D.P.R. 421 (1982). O sea, la referida expresión de *Colón v. C.R.U.V.*, supra, reitera la norma probatoria de *Báez Cancel*, supra, y debe entenderse que la mera alegación de un hecho básico, sin que haya sido debidamente establecido, no activa una presunción que permita la inferencia de un hecho presumido. Bajo la norma de *Báez Cancel*, supra, el demandante tendría que establecer la ausencia de motivo racional para el despido y la sustitución por otro empleado de diferente afiliación política que resulta afín con la de la autoridad nominadora. De otra forma no es posible ni razonable exigirle al Estado que derrote una presunción sostenida solamente por una alegación. Véase *Olivieri Morales v. Pier-*

*luisi*, 113 D.P.R. 790, 801 (1983), opinión disidente del Juez Asociado Señor Rebollo López.[8]

El Tribunal Supremo de Estados Unidos estableció en *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977), una norma probatoria-procesal muy similar. A tenor con dicho precedente, para poder prevalecer un demandante en una acción al amparo de la Constitución de Estados Unidos fundada en discrimen político, la mera alegación de su existencia no es suficiente. Al igual que en otras acciones civiles, el demandante tiene que cumplir con los requisitos de prueba necesarios para establecer su reclamación. Específicamente, tiene el peso inicial de probar por preponderancia de la prueba que la conducta protegida fue el factor "sustancial" o "motivante" para la acción de despido. Véanse: *Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 264 (1er Cir. 1987); *Rosaly v. Ignacio*, 593 F.2d 145, 148–149 (1er Cir. 1979). Una vez el empleado cumple con su deber de probar un caso prima facie, le corresponde al Estado demostrar que el demandante fue despedido por otras razones legítimas ajenas a su afiliación política. Articulado de esta forma un motivo no discriminatorio, el empleado demandante puede entonces presentar prueba de que no hubiera sido despedido *salvo por* (*but for*) sus creencias políticas. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 417 (1979); *Kercado-Melendez v. Aponte-Roque*, supra, pág. 264.

■ En este tipo de casos donde el demandante alega que fue despedido de un empleo por razones políticas, el Estado puede, además de refutar la presencia de discrimen, demostrar que la posición que ocupaba el demandante está cu-

---

[8] En *Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42 (1983), consideramos el efecto de la presunción de discrimen en el empleo establecida en la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146). Véanse, también: *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Báez García v. Cooper Labs., Inc.*, 120 D.P.R. 145 (1987).

bierta por una de las excepciones a la prohibición de despidos de empleados públicos por razones políticas. Procede, entonces, examinar desde esa perspectiva las *responsabilidades del puesto* del demandante en detalle para determinar si éste se asemeja al de un diseñador de política pública, al de un copartícipe de información confidencial o al de algún otro funcionario cuyos deberes sean tales que la afiliación partidista sea igualmente un requisito adecuado. Al llevar a cabo esta investigación, es preciso considerar los *poderes inherentes a un puesto en particular, vis-à-vis* las funciones desempeñadas por el funcionario particular que ocupa ese puesto. Sobre este aspecto, los deberes anteriores y reales del empleado despedido no son pertinentes si el cargo esencialmente comprende poderes más amplios y funciones más importantes que tiendan a convertir la filiación política en un requisito adecuado para su desempeño efectivo. *Ramos v. Srio. de Comercio*, supra; *Colón v. C.R.U.V.*, supra; *Feliciano v. Mun. de Fajardo*, supra.

Es decir, el demandado puede presentar cualquiera de sus dos (2) defensas, o ambas, luego de que el demandante haya probado los hechos básicos necesarios para que entre en vigor la presunción de *Báez Cancel v. Alcalde Mun. de Guaynabo*, supra, y haya establecido su caso prima facie. El mecanismo procesal de sentencia sumaria es el apropiado para este tipo de defensas.

## VII

La prueba aportada por el recurrente McCrillis en instancia se limitó a su propio testimonio. El mismo fue al efecto de que era votante y contribuyente del Partido Nuevo Progresista y que dicha circunstancia era conocida tanto en Navieras como en P.R.M.M.I. No se pasó prueba relacionada con la afiliación política del alegado sustituto. El resto de la prueba del demandante consistió en que éste había sido reemplazado a unos ocho (8) días del cambio de gobierno y en

que P.R.M.M.I., ante un contrato idéntico al declarado nulo, pagó al Sr. Bernard Carr —Vicepresidente Senior de Mercadeo— una suma de $60,000 en concepto de "indemnización" al momento de su resolución.

Por otro lado, Sergio Casaine sostuvo bajo juramento que, antes de entrar a P.R.M.M.I. en 1985, no conocía al demandante ni sabía de su afiliación política. Sobre este particular, el licenciado Dávila declaró también que para el 4 de enero de 1985 no conocía al demandante. La prueba aportada por los recurridos y creída por el tribunal demostró, no obstante, que las razones del despido fueron la insubordinación y la falta de cooperación. En cuanto a la controversia sobre la "indemnización" a Carr, el foro primario adjudicó que "[l]os contratos que le otorgó P.R.M.M.I. a una serie de altos ejecutivos, fueron rescindidos por la actual administración de la A.N.P.R. Entre [é]stos se rescindió el de Bernar[d] Carr. A éste P.R.M.M.I. le otorgó un contrato de consultoría. Otros de los ejecutivos que tenían contratos, ahora son funcionarios de P.R.M.M.I. y de la A.N.P.R. en los Estados Unidos". (Escolio omitido.) Opinión y sentencia parcial, pág. 14.

Los recurridos informan en su alegato que en efecto la suma que Carr recibió "correspondía a vacaciones acumuladas, 'severance pay' y a un adelanto de un contrato de consultoría que se le extendiera el cual incluía estar disponible para ser testigo en varios casos en foros federales". Véase, también, T.E. de 9 de abril de 1985, pág. 20.

Un examen de la transcripción de evidencia que obra en autos refleja que este aspecto de la controversia no se configuró plenamente en instancia desde el punto de vista evidenciario.[9] Debido a la última *ratio* de la opinión a que hoy llegamos, tal circunstancia no varía el resultado. Sin em-

---

[9] Véanse: T.E. de 27 de marzo de 1985, págs. 72–81 y 144; T.E. de 9 de abril de 1985, págs. 18–21 y 33–44.

bargo amerita, por otras razones, que se dilucide a fondo en el foro de instancia el asunto del pago de unas sumas a Carr, el concepto de dichos pagos y la posibilidad de que el demandante tenga un derecho análogo al cobro de beneficios por "ley", práctica o costumbre. El testigo Lic. Esteban Dávila admitió en el tribunal que tenía conocimiento "indirecto" del pago de estos dineros, aunque no participó en la determinación sobre su procedencia. T.E. de 27 de marzo de 1985, pág. 78 *et seq.*

Aclarado este extremo, un examen del resto de la prueba nos convence de que no hay razón para alterar las determinaciones del tribunal a quo de que la prueba de discrimen fue "insuficiente". Por el contrario, quedó probado que la verdadera razón del despido fue la insubordinación y la falta de cooperación.

■ En este caso, nuestros pronunciamientos en *Colón v. C.R.U.V.*, supra, pág. 509, son particularmente pertinentes. McCrillis, amparado en los términos contractuales, se negó a cooperar con el nuevo Presidente de P.R.M.M.I. en una etapa crítica del proceso de transición entre un gobierno y otro, privando a los nuevos incumbentes de obtener información vital sobre la situación financiera del brazo operativo de Navieras. Tanto la "eficiencia" como la "lealtad a los postulados del servicio" del demandante, quien era empleado de confianza, estaban en entredicho.

■ El recurrente argumentó ante nos en la vista oral que el despido, en este caso, debía considerarse discriminatorio a la luz de la "totalidad de las circunstancias", refiriéndose al hecho de haberse producido a escasos días del cambio de gobierno.

No podemos coincidir con el argumento de que dicha circunstancia levanta una "inferencia absoluta" de discrimen político. Tampoco coincidimos con la afirmación de que en

casos como el presente sea innecesario probar, entre otros extremos, la afiliación política de la persona que sustituye al despedido; basta saber la afiliación de aquel que despide. Dicha lógica probatoria hace poco menos que imposible —ante la desnuda alegación de discrimen— la sustitución de un empleado de confianza por razones legítimas tras el cambio de administración.

La prueba presentada por el recurrente no cumple con los requisitos que exige nuestra jurisprudencia. Tampoco puede considerarse lo suficientemente robusta como para establecer una presunción de discrimen de acuerdo con la doctrina de *Báez Cancel v. Alcalde Mun. de Guaynabo,* supra.

Por último, independientemente de la insuficiencia probatoria, el puesto que ocupaba el recurrente está dentro de la excepción a la prohibición de despidos por razones políticas.

McCrillis era uno de los principales ejecutivos de autoridad administrativa real dentro de la estructura de Navieras. Participaba en la formulación de la política pública de la corporación público-privada, particularmente en lo relativo a sus finanzas. Intervenía activamente en la preparación y evaluación de los planes a corto y largo plazo de una empresa que provee un servicio de enorme importancia para el público en general. Sus atribuciones se extendían sobre todo lo que de alguna forma interesaba a la economía de la empresa y, como resultado, a la economía del país. Por contrato, se le otorgaron unos deberes extremadamente amplios en una instrumentalidad gubernamental que desde sus comienzos ha motivado intensas controversias políticas. El recurrente tenía participación en el proyecto de presupuesto, así como refrendaba toda documentación que tuviese repercusiones financieras. De hecho, era quien mantenía una vigilancia cotidiana sobre la marcha de los asuntos financieros de la corporación. Su oficina era el centro de dirección y coordinación de la vida económica de P.R.M.M.I.; una especie de "estado mayor" donde se organizaba todo un reparto de competencias

fiscales, y donde maduraban y tomaban forma las directrices generales del *Chief Operating Officer* y Director Ejecutivo de Navieras. Véanse: *Juarbe-Angueira v. Arias*, 831 F.2d 11 (1er Cir. 1987); *Zayas Rodriguez v. Hernandez*, 830 F.2d 1 (1er Cir. 1987); *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7mo Cir. 1985), *cert.* denegado, 106 Ct. 313 (1985).

## VIII

A modo de resumen, el balance adjudicativo nos lleva a concluir que: (1) P.R.M.M.I. era una empresa público-privada al momento de los hechos alegados en la demanda; (2) los contratos aquí en controversia son nulos en todo aquello que inhibe y coarta la capacidad del Gobierno para tomar las medidas de personal que las leyes permiten, y (3) el recurrente McCrillis, además de no probar que su despido respondiera a razones políticas, era un arquitecto y ejecutor de política pública de alto rango que ocupaba un puesto donde la afiliación política era un requisito adecuado para su efectivo desempeño.

Por las razones que anteceden, *se confirmarán las sentencias recurridas. Sin embargo, se devolverán los recursos al foro de instancia únicamente para la dilucidación a fondo del asunto de la liquidación de las vacaciones acumuladas y de cualquier otro beneficio al que puedan tener derecho los recurrentes McCrillis y Ansa. En el orden jurisdiccional correcto y lógico, también seguirán los procedimientos ulteriores relativos a la reconvención presentada por el recurrente Lugo D'Acosta contra Navieras y P.R.M.M.I. por difamación y a cualquier otra reclamación instada por las partes que no sea incompatible con lo aquí dispuesto.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita.