EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Maritza Rodríguez Román y otros<br>    Apelantes<br><br>    v.<br><br>Banco Gubernamental de Fomento para Puerto Rico y otros<br>    Apelados | Apelación<br><br>2000 TSPR 93 |
|---|---|

Número del Caso: AC-1996-0006

Fecha: 19/junio/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Angel F. Rossy García

Abogado de la Parte Apelante:

            Lcdo. Ebenecer López Ruyol

Abogado de la Parte Apelada:

            Nieto, Vázquez & Rodríguez Marxuach
            Lcdo. Rafael J. Vázquez González

Materia: Daños y Perjuicios

        Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO**Error! Bookmark not defined.**

Maritza Rodríguez Román
y otros

    Demandante-Apelantes

       v.                AC-96-6     Apelación

Banco Gubernamental de Fomento
para Puerto Rico y otros

    Demandado-Apelados

Opinión del Tribunal emitida por el Juez Presidente señor Andréu García

San Juan, Puerto Rico a 19 de junio de 2000

    Nos toca hoy examinar si existe el derecho de retención de empleo para aquellos empleados de una corporación pública que cierra operaciones validamente, siendo esa corporación subsidiaria de otra corporación pública pero, independiente y separada de ésta. Estimamos que no tienen tal derecho a retención, por las razones que explicaremos más adelante.

    Examinemos los hechos que dan lugar al presente recurso.

I

    El 8 de mayo de 1981 la Junta de Directores del Banco Gubernamental de Fomento creó por resolución, a tenor con el Art. 2 de la Ley Núm.

17 de 23 de septiembre de 1948[1], según enmendada, una corporación subsidiaria llamada Corporación de Asistencia para la Educación Superior de Puerto Rico o "Puerto Rico Higher Education Assistance Corporation", en adelante PRHEAC, cuyo propósito era el de garantizar los préstamos hechos a los estudiantes por la banca comercial. Esta corporación se componía de 47 trabajadores y fue disuelta mediante resolución de la Junta. Cesó operaciones el 15 de abril de 1994, cuando todos sus empleados quedaron cesantes. Se adujo que cambios en la reglamentación federal habían hecho ineficientes las operaciones de PRHEAC, por lo que habían estado recibiendo multas por incumplimiento con dicha reglamentación. Se enfrentaban a una crisis financiera por tal motivo.

El 22 de febrero de 1994, veintidós (22) empleados unionados y cinco (5) gerenciales instaron acciones separadas, luego consolidadas, en el Tribunal de Primera Instancia contra el Banco Gubernamental de Fomento (Banco) y la Unión de empleados del Banco, PRHEAC y Great Lakes Higher Education Corporation. Alegaban ser realmente empleados del Banco asignados a una subsidiaria y por tanto les cobijaba el derecho a ser reubicados en las dependencias del banco y a competir con los demás empleados de dicha institución, conforme al principio del mérito y al criterio de antigüedad, por las posiciones que hubiese disponibles y por aquellas ocupadas por empleados del Banco con menos antigüedad que ellos. Solicitaron órdenes de entredicho provisional, preliminar y permanente que paralizaran la inminente cesantía de los empleados, ya anunciada por la corporación, y la reinstalación de éstos a sus funciones regulares; la notificación a cada empleado de un plan de cesantía general que abarcara al Banco y todas sus dependencias y que el mismo fuese publicado y aprobado por el Departamento de Estado, de acuerdo a las normas establecidas. Solicitaban además, una indemnización en concepto de daños y perjuicios por la suma de $100,000.00 para cada uno de ellos.

---

[1] 7 L.P.R.A. sec. 552, Tercero (J).

Dos días después, el Tribunal de Instancia denegó las solicitudes de entredicho provisional e *injunction* preliminar, ordenando a los demandantes a emplazar a los demandados por la vía ordinaria. Como consecuencia, el 30 de marzo de 1994, los codemandados Banco y PRHEAC presentaron una moción solicitando se dictara sentencia sumaria desestimando la demanda, fundamentándose en que PRHEAC y el Banco eran entidades distintas e independientes, que PRHEAC estaba exenta de las disposiciones de la Ley de Personal del Servicio Público y por tanto, los planes de cesantía de los empleados unionados se tenían que regir por el convenio colectivo suscrito entre PRHEAC y la Unión de Empleados del Banco Gubernamental de Fomento y en el caso de los empleados gerenciales, por el Reglamento de PRHEAC.

Las codemandadas Unión de Empleados del Banco Gubernamental de Fomento y Great Lakes Higher Education presentaron también mociones separadas solicitando la desestimación de la demanda. Aducía la primera, falta de jurisdicción e inmadurez de la controversia y la segunda se fundamentaba en que la demanda dejaba de exponer una reclamación que justificara la concesión de un remedio en su contra.

El Tribunal de Primera instancia, acogiendo las mociones de los codemandados, desestimó las acciones incoadas por los fundamentos aducidos. En cuanto al Banco y a PRHEAC resolvió además, que los demandantes no agotaron los remedios administrativos disponibles.

Los demandantes recurrieron ante nos de dicho dictamen, por lo que, luego de un cuidadoso análisis, dictamos sentencia revocando parcialmente la sentencia en cuanto a los codemandados Banco y PRHEAC. En aquel momento dijimos:

> "Reiteradamente hemos resuelto que la doctrina que requiere que se agoten los remedios administrativos antes de acudir al foro judicial es una norma de autolimitación judicial dirigida a facilitar la revisión judicial. Persigue asegurar que los tribunales tengan la información más precisa sobre los fundamentos de una actuación gubernamental, y así colocar a los tribunales en condición de tomar la decisión más informada posible sobre el recurso instado. Persigue, además, liberar a los tribunales de asuntos que pueden ser resueltos administrativamente. [...] No es una doctrina de rígida aplicación. Más bien, debe aplicarse con flexibilidad,

haciéndola valer sólo cuando a la luz de las circunstancias del caso es claro que la intervención judicial sería prematura. [...] Es por ello que hemos resuelto que se puede prescindir del requisito de agotar remedios administrativos en casos donde la cuestión litigiosa es una esencialmente de derecho, o cuando agotar tales remedios constituye una gestión inútil o inefectiva.

En este caso, no se justificaba exigir que se agotaran los remedios administrativos, como resolvió el foro a quo. La cuestión primordial que plantearon los recurrentes ante el tribunal de instancia, sobre cuya validez no pasamos juicio en esta sentencia, era esencialmente una de derecho, cuya dilucidación no requería esperar por la aportación de los conocimientos especializados de la agencia administrativa. Según los recurrentes, las cesantías contempladas y luego ordenadas por los recurridos [Banco Gubernamental de Fomento y Corporación de Asistencia para la Educación Superior en Puerto Rico] no respondían al principio del mérito y al criterio rector de antigüedad y tiempo en el servicio, conforme a lo resuelto en Calzada Quiñones v. D.A.C.O, 114 D.P.R. 757 (1983). Los recurrentes alegaron que eran realmente empleados del Banco Gubernamental de Fomento, y que como tal, tenían derecho a competir con los demás empleados del Banco por las posiciones remanentes, conforme al principio del mérito y al criterio de antigüedad. Siendo ésta la cuestión principal que planteaban los recurrentes, no era necesario agotar remedios administrativos para considerarla y resolverla.

Nótese, además, que al momento en que los recurrentes presentaron su acción judicial, era evidente que la decisión del Banco de cerrar las operaciones de la Corporación de Asistencia para la Educación Superior en Puerto Rico era final e impostergable. Las gestiones y reclamos que hicieron los recurrentes a los altos ejecutivos del Banco y a otras entidades antes de incoar la acción judicial en cuestión, y las respuestas de éstos a esas gestiones y reclamos demostraban claramente que era remota, si alguna, la posibilidad de que el Banco dejara sin efecto o modificara su intención de cesantear a los recurrentes de inmediato. En tales circunstancias, tenía poco sentido y era infructuoso exigirle a los recurrentes que agotaran los remedios administrativos disponibles antes de presentar su acción judicial contra el Banco y PRHEAC". (Citas omitidas)

Dispusimos entonces la devolución de los autos al Tribunal de Instancia para la continuación de los procedimientos a tenor con lo resuelto. El tribunal a quo interpretó nuestra orden en el sentido de que sólo tenía que resolver la cuestión de derecho, a saber, si los empleados demandantes tenían derecho a competir con los demás empleados del Banco Gubernamental de Fomento por las posiciones existentes conforme al principio del mérito y al criterio de antigüedad. Concedió a las partes un término para someter memorandos en apoyo a sus posiciones, luego de lo cual emitió sentencia desestimando sumariamente las acciones

presentadas. Inconformes los peticionarios instaron recurso en el Tribunal de Circuito de Apelaciones el cual confirmó al foro de instancia.

Los peticionarios acuden ante nos mediante un denominado recurso de apelación[2] imputando al foro apelativo la comisión de varios errores, entre éstos, que erró el Tribunal al desestimar sumariamente la demanda, resolviendo que los demandantes no eran empleados del banco, sin permitir desfilar prueba para dilucidar la situación de cada empleado; íntimamente ligado a éste, si el Banco puede crear corporaciones públicas que prive de derechos a empleados que ya habían sido contratados por éste previo a la creación de PRHEAC; si procede aplicar la doctrina de descorrer el velo corporativo entre PRHEAC y el Banco; si la Ley de Personal del Servicio Público y el derecho de retención son de aplicación para los empleados de PRHEAC; y que erró el Tribunal al no conceder un remedio en equidad para evitar la violación de la política pública y evitar una crasa injusticia.

A los fines de evaluar el recurso, el 23 de febrero de 1996, emitimos una resolución ordenando la elevación de los autos originales obrantes en el Tribunal de Circuito de Apelaciones. Así cumplida dicha resolución el 20 de junio de 1996, equivocadamente ordenamos a la parte recurrente someter su alegato, como si se trata de un auto ya expedido. Habiendo cumplido dicha parte con tal orden, la parte recurrida presentó un escrito en oposición a la expedición del auto.

Examinados la totalidad del expediente y las posiciones de las partes, estamos en condiciones de resolver.

II

El Banco Gubernamental de Fomento, instrumentalidad del Gobierno de Puerto Rico, fue creado por la Ley Núm. 17 de 23 de septiembre de 1948, 7 L.P.R.A. sec. 551 et seq., con el propósito de "ayudar al Gobierno

---

[2] Realmente el recurso apropiado es el de certiorari por no surgir del escrito ninguna de las circunstancias que permitirían una apelación en este caso. Art. 3.002 de la Ley de la Judicatura de 1994, 4 L.P.R.A., sec. 22i.

estadual en el desempeño de sus deberes fiscales y realizar más efectivamente su responsabilidad gubernamental de fomentar la economía de Puerto Rico, y especialmente su industrialización". *Id.* Mediante la Ley Núm. 97 de 26 de junio de 1974, el legislador añadió al apartado Cuarto del Art. 2, (7 L.P.R.A. sec. 552), conocido como Carta Constitucional del Banco, los incisos (I) y (J). En el inciso (J) se le confirió la facultad al Banco de crear, mediante resolución, empresas subsidiarias o afiliadas, que constituirían a su vez instrumentalidades gubernamentales independientes y separadas del Banco, con poderes, derechos, funciones y deberes que les fueran conferidos al Banco y éste les hubiese delegado.[3]

Conforme a este inciso el Banco creó, mediante la Resolución Núm. 4530, la Corporación de Asistencia para la Educación Superior de Puerto Rico (PRHEAC), que a tenor con tal inciso, cobró existencia jurídica como instrumentalidad gubernamental del Estado Libre Asociado de Puerto Rico, independiente y separada del Banco. Por disposición de ley, la Junta de Directores del Banco **es** la Junta de Directores de todas y cada una de las subsidiarias así creadas. Sec. 2 (j), supra.

Los recurrentes invocan la doctrina del álter ego, afirmando que ellos son realmente empleados del Banco y como tales, tienen derecho a

---

[3] (J) Crear empresas subsidiarias o afiliadas mediante resolución de su Junta de Directores cuando en opinión de ésta tal acción es aconsejable, deseable o necesaria para el desempeño de las funciones del Banco o para cumplir con sus propósitos institucionales o para ejercer sus poderes. El Banco podrá vender, arrendar, prestar, donar o traspasar cualesquiera de sus bienes a las empresas subsidiarias así creadas. **Las subsidiarias creadas por el Banco en virtud del poder que se le confiere en este inciso constituirán instrumentalidades gubernamentales del Estado Libre Asociado de Puerto Rico independientes y separadas del Banco, y tendrán todos aquellos poderes, derechos, funciones y deberes que esta ley le confieran (sic) al Banco y que la Junta de Directores de éste les delegue. La Junta de Directores del Banco será la Junta de Directores de todas y cada una de dichas subsidiarias, con excepción de la subsidiaria a conocerse con el nombre de Fondo para el desarrollo del Turismo en Puerto Rico**, la cual tendrá una Junta de Directores compuesta por el Presidente del Banco Gubernamental de Fomento para Puerto Rico, el Director Ejecutivo de la Compañía de Turismo, y el Secretario de Hacienda. [...] Las disposiciones del Artículo 5 de este título se aplicarán a todas las empresas subsidiarias así organizadas y que estén sujetas al control del Banco. (Énfasis nuestro)

competir por las posiciones remanentes en el Banco conforme al principio del mérito y al criterio rector de antigüedad. En apoyo de esa contención enumeran una serie de circunstancias, esto es, que ambas agencias comparten el mismo cuerpo directivo, que los empleados de ambas corporaciones públicas cuentan con la misma oficina de empleo, utilizan el mismo formulario para verificar empleos, utilizan la misma tarjeta de identificación, utilizan los mismos cheques, tienen el mismo plan médico. Alegan, además, que la Asociación de Empleados del E.L.A. las tiene bajo el mismo número de agencia, tienen el mismo número de seguro social patronal y la misma cuenta con el Fondo del Seguro del Estado y realizan a discreción traslados de personal entre ambas instrumentalidades.

En Puerto Rico hemos acogido las doctrinas de descorrer el velo corporativo (álter ego), el patrono sucesor (successorship) y la doctrina de "un sólo patrono", que se desarrollaron jurisprudencialmente en los tribunales federales y la Junta Nacional de Relaciones del Trabajo para proteger los derechos de los obreros. La doctrina de un sólo patrono se utiliza generalmente cuando se trata de compañías que coexisten. Las doctrinas del álter ego y de patrono sucesor se utilizan cuando una compañía sustituye a la otra. J.R.T. v. Asociación, 117 D.P.R. 20, 29 (1986); Véase además, Fugazy Continental Corp. v. N.L.R.B. 725 F.2d. 1416, 1419 (Cir. D.C. 1984 ); Penntech Papers, Inc. v. N.L.R.B. 706 F.2d. 18, 24 (1er Cir. 1983). En específico, la doctrina del álter ego, en el campo laboral, se utiliza como norma general cuando una corporación toma el control de otra entidad, que usualmente desaparece y se demuestra que esa sustitución tiene propósitos ilegales, constituye una violación de política pública, se perpetuaría una injusticia o un fraude, o se incumpliría con una obligación. El análisis bajo esta doctrina requiere que se demuestren propósitos o intentos de cometer actos ilegales. J.R.T. v. Asociación, supra, a la pág. 29.

Examinada la totalidad del expediente vemos que efectivamente, ambas agencias comparten una administración centralizada lo cual, según el récord ante nosotros, tiene su explicación en el hecho que PRHEAC

contrataba los servicios administrativos y otros servicios de administración de personal con el Banco, ya que por ser una agencia pequeña no ameritaba tener una propia oficina administrativa y de Recursos Humanos. <u>PRHAEC pagaba por estos servicios al Banco</u>. Como parte de esos servicios de administración de personal y apoyo contratado, se destacaba con frecuencia personal del Banco a las oficinas de PRHEAC. Sin embargo, éstos siempre se mantuvieron en la nómina del Banco.

Además, ambas agencias tenían diferentes números de seguro social patronal, cuentas diferentes con el Fondo del Seguro del Estado y eran representados sindicalmente por diferentes unidades apropiadas certificadas por la Junta de Relaciones del Trabajo de Puerto Rico.

También, es infructuoso pretender extender la doctrina del álter ego a estas dos agencias, ya que es **por mandato de la propia ley** que éstas constituyen "instrumentalidades gubernamentales del Estado Libre Asociado independientes y separadas." Sec. 2 (j), supra. El distintivo fundamental para que una corporación pública sea considerada como una subsidiaria de otra corporación pública consiste en que el estatuto en virtud del cual surge la existencia de la primera le imparta a ésta dicha característica, además de su personalidad jurídica propia. Véase <u>Torres Ponce</u> v. <u>Jiménez</u>, 113 D.P.R. 58, 63-65 (1982). El estatuto habilitador en virtud del cual PRHEAC fue creada, la constituyó en corporación pública independiente del Banco.

Los apelantes argumentan que PRHEAC no ha sido incorporada en el Departamento de Estado. Olvidan los apelantes que la Ley General de Corporaciones, 14 L.P.R.A. sec. 1101 *et seq.*, no es aplicable a las corporaciones públicas pues dicho estatuto fue concebido para reglamentar específicamente la creación y el funcionamiento de las corporaciones privadas y es para éstas que se exige el Registro en el Departamento de Estado. El estatuto orgánico que habilitó la creación de PRHEAC la constituyó en corporación pública sin necesidad de registro de clase alguna.

II

Se cuestiona la validez constitucional de la delegación de poderes que la Asamblea Legislativa hace en la corporación pública para que tenga la capacidad de crear o constituir instrumentalidades gubernamentales subsidiarias que sean independientes y separadas.

Durante el desarrollo del derecho administrativo, sobre todo en sus comienzos, se retó muchas veces la validez constitucional de la delegación en las agencias de aquellas facultades originalmente depositadas en los tres poderes gubernamentales. El énfasis estaba en aquel momento en la conciliación de la tradición constitucional con esa delegación de poderes.

Hoy día pocas veces se duda de la validez de este tipo de delegación, que fue la fuente de las decisiones judiciales de los comienzos del derecho administrativo. Desde el 1935, año en que se creó el "Social Security Act", comenzó un gran desarrollo en las áreas de legislación social mediante la cual las agencias administrativas se constituyeron en las principales proveedoras de los servicios gubernamentales y el énfasis principal de la casuística interpretativa de dicha legislación recayó en el **procedimiento administrativo.** B., Schwartz, *Administrative Law,* sec. 1.14.

En la actualidad se sostiene la validez de la delegación siempre y cuando que en la ley que crea la agencia se establezcan normas adecuadas, pautas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de la agencia resulten arbitrarias o caprichosas. Dichos criterios no tienen que ser expresos, pueden surgir, inclusive, del historial legislativo y pueden ser amplios y generales. Si tiene un fin o interés público, por lo general es suficiente justificación para que se sostenga la delegación. Véase, Luce & Co. v. Junta de Salario Mínimo, 62 D.P.R. 452 (1944); Hilton Hotels International, Inc. v. Junta de Salario Mínimo, 74 D.P.R. 670 (1953); López Salas v. Junta de Planificación, 80 D.P.R. 646 (1958); Hernández v. Montero Cuevas, 88 D.P.R. 785 (1963);

M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987); Viajes Gallardo v. Clavell, 131 D.P.R. 275; D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, Ed. Forum, secs. 2.1-2.5; B., Schwartz, supra, secs. 2.10-2.30; 2 Am Jur 2d, *Administrative Law*, sec. 56.

La definición de lo que es una corporación pública se encuentra en 31 L.P.R.A. sec. 101, que reglamenta quiénes son personas jurídicas en Puerto Rico. A estos efectos nos dice el Código Civil:

> "Sec. 101 Personas jurídicas– Quiénes lo son
>
> 1. Las corporaciones y asociaciones de interés público, con personalidad jurídica reconocida por la ley.
>
> Su personalidad empieza desde el instante mismo, en que con arreglo a derecho, hubiesen quedado validamente constituidas.
>
> 2. Las corporaciones, compañías o asociaciones de interés particular, sean civiles, mercantiles o industriales, a las que la Ley conceda personalidad jurídica."

Hemos interpretado que persona, en el sentido jurídico, es todo ser capaz de [tener] derechos y obligaciones y que persona jurídica es, pues, la colectividad de personas o conjunto de bienes que, organizados para la realización de un fin permanente, obtiene el reconocimiento del estado como sujeto de derecho. **La persona jurídica recibe su personalidad directamente de la ley, por lo que los límites de sus facultades, derechos y responsabilidades están fijados por la ley creadora.** Rivera Maldonado v. E.L.A., 119 D.P.R. 74 (1987).

De forma igual se ha interpretado en el derecho administrativo federal. "The jurisdictional principle is the root principle of administrative power. The statute is the source of agency authority as well as of its limits. If an agency act is within the statutory limits (or vires), its action is valid; if it is outside them (or ultra vires), it is invalid. [...]" B., Schwartz, supra, sec. 4.4.

La sección 103 del Título 31 nos dice que la capacidad civil de las corporaciones, compañías y asociaciones se regulará por **las leyes que las**

**hayan creado o reconocido.** El artículo 104 establece que las personas jurídicas pueden adquirir y poseer bienes de todas clases, así como contraer obligaciones, y ejercitar acciones civiles o criminales, conforme a las leyes y reglas de su constitución.

La sección 2102 del Título 3 de L.P.R.A. (Ley de Procedimiento Administrativo Uniforme) también caracteriza la corporación pública. "Agencia", para los fines de dicha ley, significa cualquier junta, cuerpo, tribunal examinador, **corporación pública**, comisión, oficina independiente, división, administración, negociado, departamento, autoridad, funcionario, persona, entidad o cualquier instrumentalidad del Estado Libre Asociado de Puerto Rico u organismo administrativo autorizado por ley a llevar a cabo funciones de reglamentar, investigar y/o que pueda emitir una decisión, o con facultades para expedir licencias, certificados, permisos, concesiones, acreditaciones, privilegios, franquicias, acusar o adjudicar. Se exceptúan los mencionados en dicha ley, por ejemplo, municipios, sus entidades o corporaciones, la rama legislativa, rama judicial, la oficina del gobernador, etc.

La corporación pública es una criatura gubernamental cuya creación es en función de las necesidades del Estado.

> On the other hand, a public corporation being an instrument or means of government, is subject to creation or dissolution at the will of the **legislative body or lawmaking power**, and in total disregard of the wishes of the members who compose it. In the same manner its charter is subject to change or amendment.
>
> While all corporations are public in the sense that they affect and are dependent upon the public to a greater or lesser extent, strictly speaking, a public corporation is one that is created for political purposes with political powers to be exercised for purposes conected with the public good in the administration of civil government. It is an instrument of the government subject to the control of the legislature, and its members are officers of the government appointed for the discharge of public duties; and where a corporation, exercises all of its franchises for public purposes, it is a public corporation. Corporations in which the public is interested only in their objects and in which the whole interest is not in the government or the corporation is not created for administration of political power, are private. Stated generaly, a public corporation is a corporation created merely for purposes of government, as distiguished from a private

corporation, which is one that is created for other purposes than those of government. Statutes may be found embodying the substance of this definition. (Énfasis nuestro) *Fletcher, Cyclopedia Corporation*, Vol. I, Sec. 58, (1990, revisada 1998) a la pág. 877.

Mediante la Ley Núm. 97 de 26 de junio de 1974, el legislador enmendó la ley para añadir al apartado Cuarto del Art. 2, (7 L.P.R.A. sec. 552), conocido como Carta Constitucional del Banco, los incisos (I) y (J), donde se faculta al Banco a crear instrumentalidades separadas e independientes del Banco.

No hay duda de que al Banco le fue conferida la delegación de la función legislativa de crear subsidiarias que fueran independientes y separadas, esto es, de constituir corporaciones de interés público que tuviesen el reconocimiento de nuestras leyes como sujetos de derecho.

El Banco Gubernamental de Fomento se creó en el año 1942 y desde entonces ha tenidos dos funciones principales.

Por un lado, ha sido su responsabilidad y la de sus subsidiarias, promover el desarrollo de la economía de Puerto Rico, proveyendo las fuentes de financiamiento que fueran necesarias para incentivar el desarrollo del sector privado, industrial, comercial y cooperativista en aquella clase de riesgos que no ha estado dispuesta a asumir la banca comercial privada, dado que ésta evalúa la solicitud de préstamo a base de la recuperabilidad del préstamo y de la capacidad de pago del que lo solicita. Las personas que habrían de beneficiarse son aquellos a quienes no les han concedido préstamos por la banca privada por el alto riesgo de los mismos. En muchas ocasiones proveer ese financiamiento tiene como consecuencia el que no se logre recobrar la inversión en el préstamo.

Fue la intención de que el Gobierno, mediante el Banco, proveyese una fuente de financiamiento a personas naturales o jurídicas, dedicadas a la manufactura, comercio, agricultura o turismo, (con énfasis en los medianos y pequeños comerciantes) mediante préstamos directos, garantías de préstamos, así como de inversiones de capital. Tenía como propósitos, entre otros, desarrollar una economía puertorriqueña más sólida,

actividades que propendan a la sustitución de importaciones de bienes y servicios, generar empleos sin tener que depender tanto de los fondos federales. Véase, Debate legislativo Cámara de Representantes, P. de la C., Ley 22, 24 de julio de 1985, pág. 7; Informe conjunto de la Cámara de Representantes de 20 de julio de 1985.

Además de esta función, el Banco Gubernamental de Fomento provee financiamiento a distintas instrumentalidades gubernamentales que requieren préstamos para cumplir sus propósitos públicos, actúa como agente fiscal así como asesor financiero de todo el gobierno, tanto central como municipal y de las diversas corporaciones públicas de Puerto Rico. Es decir, se combinaron en una misma entidad las funciones de financiamiento tanto público como privado. *Id.*

Como principal proveedor de financiamiento del sector **público** se le requiere que acuda frecuentemente a los diferentes mercados de fondos para tomar dinero a préstamo en cantidades sustanciales o servir de garantizador de emisiones de deuda de dicho sector. Esto requiere que su estado de situación no refleje una actividad de alto riesgo, que pueda poner en peligro el pago de sus obligaciones.

Véase, Debate legislativo en torno al P. de la S. 807 de 2 de mayo de 1974 págs. 101 a la 106.

Puerto Rico enfrentó uno de los períodos económicos más difíciles entre los años 1973 al 1984, cuando surgieron la crisis mundial del petróleo y la segunda gran recesión de los ochenta. El índice de desempleo en Puerto Rico alcanzó la cifra sin precedente de 24.4, provocando la detención del crecimiento económico. El BGF, como vehículo del Estado, cuya política pública fue la de promover la economía del país, tuvo que responder con creatividad al momento histórico. Precisamente, fue en 1974 que se enmendó la Ley del BGF para facultar al Banco a crear instrumentalidades separadas e independientes de éste.

> "Estos fueron años de actividad intensa y compleja para el BGF. En 1974 el BGF por primera vez acudió al mercado con una venta en subasta competitiva de Notas en Anticipación de ingresos y Contribuciones para el Gobierno del Estado Libre Asociado que permitió acceso rápido a fuentes de financiamiento interino

[...]. En 1975, al cerrarse las puertas del mercado de bonos municipales en los Estados Unidos, y ante la creciente resistencia de los bancos comerciales a continuar financiando la deuda pública a corto plazo, el BGF negoció el primer Contrato de Compra de Pagarés, que permitió que Puerto Rico tuviera acceso a financiamiento. También en 1975, el BGF acudió por primera vez al mercado europeo a vender obligaciones de Puerto Rico. [...] En 1976 el BGF desarrolló un concepto completamente nuevo para allegar fondos a las arcas gubernamentales: el concepto de bonos del ahorro.

En 1977, el BGF estableció el Fondo para el Desarrollo de Puerto Rico, una subsidiaria que podía realizar inversiones en acciones de capital y garantizar préstamos a largo plazo para empresas privadas que no podían obtener crédito de otras instituciones financieras. En 1978, el Fondo para el Desarrollo emitió obligaciones por la cantidad de $25 millones para complementar su capitalización original de $5 millones y poder realizar una mayor aportación al sector privado. [...]

También para el 1977, el BGF promovió activamente la creación de la Corporación para el Financiamiento de la Vivienda en Puerto Rico, cuyas funciones principales eran el financiamiento de la construcción, reconstrucción, mejoramiento y rehabilitación de vivienda para familias de ingresos bajo y moderados; el otorgamiento de préstamos hipotecarios para ayudar a familias de ingresos limitados a adquirir una residencia; y la garantía de financiamiento interino para proyectos de construcción bajo los Fideicomisos Hipotecarios que habrían de crearse después de 1985. [...]

De suma importancia fue la creación, también en 1977, de la Autoridad para el Financiamiento de Facilidades Industriales y de Control Ambiental (AFICA). AFICA tendría la capacidad de operar como un mecanismo alterno para la colocación pública de bonos de obligaciones limitadas de emisores privados. [...]

En 1981 se estableció la Corporación para la Asistencia de la Educación Superior en Puerto Rico que debía administrar el Programa Federal de Garantía de Préstamos a Estudiantes en Puerto Rico. Bajo este programa, la subsidiaria garantiza la cantidad prestada por un banco comercial a un estudiante, y garantiza también la liquidación de la totalidad de la deuda en caso de la muerte del prestatario. Durante los pasados 12 años desde su creación, la CAES [PRHEAC] ha garantizado préstamos por más de $434 millones para beneficio de alrededor de 171,000 estudiantes en todas las áreas del saber y en todos los niveles universitarios, incluyendo especialidades post graduadas como Derecho. El Banco Gubernamental de Fomento también estableció la Asociación de Préstamos a Estudiantes de Puerto Rico, creada para ofrecer préstamos a un interés bajo a estudiantes para emprender estudios post-secundarios. La intención de esta subsidiaria era llenar un espacio que todavía no había pasado a ocupar la banca privada. A través de la APE, el Banco otorgó préstamos en exceso de $24 millones y vendió su cartera en 1988, cuando ya el sector bancario privado había comprendido la necesidad de este tipo de préstamo y la rentabilidad del mismo.

En término generales, estos años fueron de gran creatividad y productividad del Banco Gubernamental de Fomento. Fueron años en que la adversidad, creada como reflejo de la gran crisis del petróleo, fue, literalmente, la madre de la invención. [...]".
*Innovación, experiencia y solidez para Puerto Rico,* Publicación del Banco Gubernamental de Fomento, págs. 109-112 (1992).

Evidentemente, gran parte de esos logros no hubiesen sido posibles de la Legislatura no haber dotado al Banco con tan amplios poderes y en

contrario, haberlo hecho pasar durante el proceso de cada creación de una subsidiaria, por el crisol de ésta, en temas en que la Legislatura en pleno no tendrían ni la pericia, ni los elementos de juicio, restándole el dinamismo, la rapidez y la pericia que tales actividades requerían.

Como vemos, la facultad que la Legislatura le delegó al Banco a través de la acción legislativa se circunscribe a crear subsidiarias independientes y separadas, en aquellos casos en que sea aconsejable, deseable o necesario para cumplir con sus funciones, poderes y propósitos, y que tendrán, dentro del universo de poderes, derechos, funciones y deberes del Banco, aquellos que el Banco les delegue. El Banco jamás podrá delegar más poderes de los que él mismo tenga y los poderes del Banco están detalladamente constituidos en su ley creadora los cuales limitan su ámbito de autoridad.

La instrumentalidad se crea para llevar a cabo una tarea específica, que viene a ser una limitada dentro de las múltiples tareas del Banco. Su atención está enfocada a la tarea encomendada. Su Junta de Directores es la Junta de Directores del Banco, nombrada por el Gobernador, lo que asegura la continuidad de la política pública del Ejecutivo. La Legislatura no claudica su control ante estas subsidiarias, ya que es un acto legislativo el que promulga la facultad de crearlas por vía de resolución, limita sus facultades del universo de éstas que por acto legislativo le fueran otorgadas al Banco, y en última instancia, puede la Legislatura despojar al Banco de la facultad delegada.

Ciertamente, "[l]as corporaciones públicas son parte importante de la organización administrativa del Estado Moderno [y] las mismas ocupan sectores muy amplios de la vida económica moderna. **La variedad de formas y la enorme disparidad de regímenes jurídicos a que pueden estar sometidos**, han dado paso a un amplio temario". McCrillis v. Autoridad de Navieras de Puerto Rico, 123 D.P.R. 113, 126 (1989). (Citas omitidas, énfasis nuestro). Véase además, A.R. Brewer Carías, *Las Empresas Públicas en el Derecho Comparado*, Universidad Central de Venezuela, Publicaciones de la Facultad de Derecho, Caracas, pág. 29 (1967). "In the

great mayority of cases, the various forms of public enterprise have developed as empirical responses to specific needs, **without any preconceived theory, and without much uniformity.**" W. Friedmann, *The Public Corporation: A comparative Symposium*, Canada, Ed. The Carsell Company, Limited, 1954, p. 542. (Énfasis nuestro)

Dada la variedad de formas y funciones que puede ejercer una corporación pública, y de que su génesis, en la mayoría de los casos, responde a satisfacer unas necesidades históricas específicas, las cuales constituyen **un fin público**, la Legislatura puede mediante ley, delegar la función de crearlas **de la manera que más eficazmente se sirva a esas necesidades urgentes que se intentan satisfacer**, siempre y cuando la legislación que las habilite cuente con unas normas adecuadas o criterios y principios inteligibles que regirían tanto su creación como su conducción, para evitar que sus actuaciones resulten arbitrarias o caprichosas. Ningún estatuto ni cláusula constitucional impide que la Legislatura delegue esa función.

El requisito universal de la génesis de una corporación pública[4], tanto en regímenes constitucionales como en otros tipos de gobiernos, es que sea una creación gubernamental. *"Creation of the Public corporation. It appears to be a universal practice that public corporations are created by a* **governmental procedure**, *either a* **special statute** *or a* **governmental ordinance**. *Unlike the commercial company they do not automatically come into existence by fulfilling certain statutory requirements."* *Id* a la pág. 558. (Énfasis nuestro)

"Ante todo debe señalarse que **generalmente** las [corporaciones públicas] son **creadas o reguladas** por un acto legislativo que establece sus poderes, deberes e inmunidades, que prescribe la forma de su gestión y dirección y, que, sobre todo, establece la regulación de sus relaciones

---

[4] Véase, a modo de comparación de las diversas formas en que puede "nacer" una corporación pública, la experiencia en algunos de los países de sistemas de economía planificada (o socialistas) donde por virtud de acción gubernamental se expropiaron y nacionalizaron las empresas privadas. Es decir, las corporaciones públicas "nacieron" de sujetos de derecho privado ya existentes. A.R. Brewer Carías, *Las Empresas Públicas en el Derecho Comparado*, supra, a la pág. 59.

con los departamentos ministeriales." A.R. Brewer Carías, *Las Empresas Públicas en el Derecho Comparado*, supra, a la pág. 84.

Ya hemos estimado que en muchas ocasiones estas corporaciones públicas nacen y son producto de situaciones de emergencia, y para responder a éstas han sido dotadas por el legislador de la flexibilidad y autonomía necesarias para ser exitosas en un ambiente competitivo. McCrillis v. Autoridad de Navieras, supra, a la pág. 127.

> "In the common law countries, where the government still enjoys considerable inmunities and privilegdes in the fields of legal responsabilities, taxation, or the binding force of statutes, other considerations played their part. It seemed necessary to create bodies which, if they where to compete on fair terms in the economic field, had to be separate and distinct from the government as regards inmunities and privileges." W. Friedmann, supra, pág. 358.

Estamos hablando de un cambio fundamental en la estructura del Gobierno puertorriqueño, de repercusiones trascendentales, ya bien para proveer al BGF de herramientas para que pudiera competir en igualdad de condiciones con la banca privada, liberándolo de restricciones y permitiendo flexibilidad y dinamismo, ya bien para hacer a estas corporaciones recipiendarias de ayudas de fondos federales que no podría recibir de ser una afiliada, o para hacer accesible unos fondos exentos de contribuciones, o para no comprometer y desvincular el crédito del ELA y del BGF con financiamientos de alto riesgo, o por todas las anteriores razones, la Legislatura tuvo a bien, precisamente en el año 1974 y dadas las circunstancias del momento, delegar en el BGF la facultad de crear, por resolución, corporaciones públicas que fueran a su vez independientes y separadas. Véase además, PUBLIC HEARING PC 56 "Create the Development Bank of Puerto Rico. Committees on Finance, on Government and on Socioeconomic Development. 18 June 1985. Cuestionar la sabiduría de tal delegación, que propulsó y sigue propulsando tanta actividad positiva económica y sobre la cual está todavía montado todo un aparato económico y social, transgrede nuestra facultad constitucional. Máxime cuando el control último de esas corporaciones lo sigue teniendo la Legislatura.

Fue dentro del poder conferido por la Asamblea Legislativa que el Banco creó y operó a PRHEAC, a tenor con el fin y propósito de su creación. Asimismo su disolución se hizo conforme a derecho. Nada en el récord indica que ello se hiciese con propósitos o intentos de cometer actos ilegales. Por tanto, no tienen razón los recurrentes en sus planteamientos en cuanto al error discutido.

III

Los demandantes alegan que era de aplicación para los empleados de la subsidiaria PRHEAC el derecho de retención, como parte esencial del principio del mérito de la Ley de Personal del Servicio Público, así como la doctrina establecida en Calzada Quiñones v. D.A.C.O., 114 D.P.R. 757 (1983). Argumentan que al no acomodar a los empleados de PRHEAC en las posiciones remanentes o en aquellas que actualmente ocupan empleados transitorios o de menos antigüedad en el Banco, tomando tanto el Banco como a PRHEAC como un universo, se violaron las disposiciones de la Ley de Personal.

La Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. secs. 1301 et seq., tiene como política pública "establecer el mérito como el principio que regirá todo el servicio público, de modo que sean los más aptos los que sirvan al Gobierno y que todo empleado sea seleccionado, adiestrado, ascendido y retenido en su empleo en consideración al mérito y a la capacidad, sin discrimen por razones de raza, color, sexo, nacimiento, edad, origen o condición social, ni por ideas políticas o religiosas." 3 L.P.R.A. sec. 1311(1). Paradigma de este principio es el derecho de retención, esto es, el de ser provisto de seguridad en el empleo a aquellos empleados de carrera idóneos, que satisfagan los requisitos de productividad y disciplina que deben prevalecer en el servicio público. 3 L.P.R.A. sec. 1336.

Sin embargo, la propia Ley expresamente excluye unas ramas o agencias a las cuales no aplicarán sus disposiciones. A estos efectos reza:

**"1338. Exclusiones**

Las disposiciones de este Capítulo no aplicarán a las siguientes ramas, agencias e instrumentalidades del Gobierno:

Rama Legislativa

Rama Judicial

**Los empleados de agencias o instrumentalidades del Gobierno que funciones como empresas o negociados privados**

**Los empleados de agencias o instrumentalidades del Gobierno que tengan derecho a negociar** colectivamente mediante leyes especiales

La Universidad de Puerto Rico

La Oficina del Gobernador propia y

La Comisión Estatal de Elecciones de Puerto Rico

En lo que respecta a la Rama Judicial y a la Rama Legislativa, éstas se regirán para la administración de personal por las disposiciones vigentes aplicables en particular a cada una de estas Ramas del Gobierno."[5] (Énfasis nuestro)

No obstante estas exclusiones, que obedecían, en cuanto a las ramas del gobierno, al "respeto al principio de la separación de poderes, y en cuanto a las agencias públicas, en evitación de cualquier conflicto que pudiera surgir entre las disposiciones de la ley y los convenios colectivos que con respecto a la gran mayoría de los empleados regían en esas agencias"[6], la política pública del Estado Libre Asociado ha sido la de extender el principio del mérito a todo el servicio público, incluso a las agencias e instrumentalidades excluidas por la Ley de Personal.[7] A esos efectos, la Asamblea Legislativa, al adicionar la Sección 1338, *supra*, a la Ley de Personal, expresamente disponía:

"Las agencias e instrumentalidades aquí excluidas bajo los incisos (3) y (4) deberán adoptar, con el asesoramiento de la Oficina de Personal, y dentro de los próximos 120 días de la aprobación de esta ley, un reglamento de personal incorporando el principio del mérito que regirá las normas de personal de aquellos empleados no cubiertos por convenios colectivos. Copia de los reglamentos así aprobados serán enviados a la Asamblea Legislativa de Puerto Rico."[8]

A tenor con este mandato, PRHEAC promulgó un Reglamento de Personal incorporando el principio del mérito para todos aquellos empleados gerenciales y aquellos no cubiertos por convenio colectivo alguno. También disponía de convenio colectivo que regía las relaciones laborales entre los empleados unionados y PRHEAC. La vigencia de este convenio se extendió hasta el 30 de junio de 1994. Por tanto, no siendo de aplicación la Ley de Personal del Servicio Público, era el convenio colectivo el rector para los empleados unionados y el

---

[5] Es menester señalar que la antedicha disposición fue enmendada en 1996 para añadirle una octava exclusión, a saber, " (8) El Consejo de Desarrollo Ocupacional y Recursos Humanos, adscrito al Departamento del Trabajo y Recursos Humanos".

[6] Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40, 47 (1980); Aut. de Puertos v. Municipio de San Juan, 123 D.P.R. 496, 502 (1989)

[6-] McCrillis v. Aut. Navieras de P.R., 123 D.P.R. 113, 132 (1989); Reyes Coreano v. Director Ejecutivo, *supra*, pág. 47.

[8] Mediante la Ley Núm. 18 de 22 de febrero de 1979 se enmendó la mencionada sección, suprimiendo este penúltimo párrafo, por haberse cumplido en exceso dichos términos.

Reglamento promulgado para los empleados gerenciales y no unionados. Surge de los autos que las cesantías siguieron los procedimientos instituidos tanto en el Reglamento como en el convenio colectivo.

Resulta inaplicable al caso de autos la doctrina esbozada en el caso de Calzada Quiñones v. D.A.C.O., supra, en el cual determinamos que para que una reducción de personal por falta de fondos o eliminación de programas en una agencia cumpla con las disposiciones de la Ley de Personal en cuanto al principio del mérito, es preciso que la misma se efectúe tomando todo el universo de las divisiones de la agencia o instrumentalidad en cuestión y se utilice el criterio de antigüedad como elemento de retención.

En Calzada cesantearon de su empleo de carrera a una empleada con 26 años de servicio, al quedar suprimido un programa de esa agencia por razón de economías. El Departamento de Asuntos del Consumidor (D.A.C.O.) es una agencia de la Administración Central y por tanto, no excluida de las disposiciones de la Ley de Personal en cuanto al principio del mérito y al derecho de retención. La Junta de Apelaciones del Sistema de Personal (JASAP) sostuvo la validez de la cesantía decretada resolviendo que no era necesario someter a los empleados al proceso de competencia por antigüedad toda vez que suprimido el programa, todos los empleados dentro del mismo quedaban cesantes. JASAP consideró cada programa dentro de la agencia como un universo separado e independiente para fines del proceso de determinar el orden de prelación en que se decretarían dichas cesantías y por tanto, no darle a la competencia por antigüedad entre empleados de una misma clasificación de otros programas de la agencia. Apelado dicho dictamen, el entonces Tribunal Superior denegó el recurso de revisión de la decisión administrativa solicitado. Al revocar dicho dictamen, afirmamos entonces que aunque la Ley de Personal autoriza la separación de un empleado del servicio público, sin que implique destitución, entre otras razones, debido a la falta de fondos9, era menester que el poder nominador decretara las cesantías acatando fielmente la ley así como las normas y trámites reglamentarios. *Id.* a la pág. 760.

En el caso de marras a todas luces no podría tomarse a PRHEAC como parte del universo total del Banco, porque la misma ley habilitadora de PRHEAC dispone lo contrario. Nos encontramos ante una instrumentalidad "independiente y separada" del Banco y por tanto no procede la relocalización de los empleados de una corporación pública independiente a otra, con la consecuencia agravante de dejar cesantes a otros empleados validamente contratados por el Banco para ser desplazados por aquellos de mayor antigüedad de otra agencia independiente que cesa en sus operaciones. Ante la realidad de que la cesantía llevada a cabo fue total, no quedó posibilidad de relocalizar empleados ni retenerlos en posiciones existentes.

En casos como el de autos, donde se decretan las cesantías de todos los empleados por razón del cierre de una corporación pública subsidiaria creada por otra corporación pública cuyo estatuto habilitante le ha impartido personalidad jurídica propia, separada e independiente de la que la creó, no procede el reclamo de

ubicar en la corporación sobreviviente los empleados contratados por la corporación subsidiaria, de acuerdo al principio del mérito y al criterio de antigüedad. El cierre de la corporación subsidiaria del Banco, PRHEAC, hace que todos los empleados contratados por ésta sean automáticamente cesanteados, ya que dicho cierre tiene como consecuencia la desaparición de todas las plazas, unionadas o gerenciales, de la corporación que cierra.

IV

Ahora bien, los recurrentes alegan que se equivocó el Tribunal de Primera Instancia al desestimar sumariamente la demanda, resolviendo que los demandantes no eran empleados del banco sin permitirles presentar evidencia para establecer sus alegaciones al efecto de que sí lo eran.

De un cuidadoso análisis de la totalidad del expediente en este caso, surgen alegaciones de que algunos de los demandantes fueron contratados por el Banco **antes de la creación de PRHEAC**. Si el proceso de transferencia de estos empleados no se llevó a cabo mediando una renuncia válida al empleo en el Banco, existe la posibilidad de que tales empleados hayan retenido su condición de empleados del Banco, por lo que tal vez puedan ser acreedores a algún remedio. La sentencia dictada sumariamente está totalmente huérfana de determinación alguna sobre este particular. Tampoco hemos encontrado en los autos evidencia alguna que sostenga la disposición sumaria de dicha alegación. Por tanto, el Tribunal de Instancia debió haber recibido prueba en aquellos casos de empleados que fueron contratados **antes de la existencia de la subsidiaria** que le permitiera determinar cuál era su verdadero patrono. Para ello era relevante establecer si en algún momento renunciaron validamente al Banco para formar parte de PRHEAC, **o si sencillamente fueron transferidos a la subsidiaria reteniendo su empleo con el Banco.**

Por los fundamentos expuestos y considerado el escrito de apelación presentado en este caso como una Solicitud de Certiorari, por ser el recurso apropiado[10], se expedirá dicho auto y se modificará la sentencia del Tribunal de Circuito de Apelaciones a los únicos fines de ordenar la devolución de los autos al Tribunal de Primera Instancia para que se celebre vista en forma compatible con lo aquí resuelto[11]. Quedará confirmada, sin embargo, la sentencia dictada por dicho tribunal apelativo respecto a aquellos empleados que no eran empleados del Banco Gubernamental de Fomento previo al momento en que comenzaron a prestar servicios como empleados de PRHEAC.

---

[9] 3 L.P.R.A. sec. 1336
[10] 4 L.P.R.A. sec. 22j.

[11] Cabe la posibilidad de que el remedio a que puedan ser acreedores aquellos demandantes que hayan retenido su condición de empleados del Banco, de así determinarlo el Tribunal de Primera Instancia después de celebrada la referida vista, sea el de reinstalación como empleados de dicha entidad. Si tal remedio aparejara la cesantía de otras personas actualmente empleadas por el Banco por ser de menor antigüedad que los peticionarios a ser reinstalados, tales otras personas tendrían derecho a intervenir y a ser oídas en el presente litigio antes de que se dicte el referido remedio. El Tribunal de Primera Instancia tomará las medidas que sean necesarias para garantizar ese derecho.

José A. Andréu García
Juez Presidente